**In re U. S. FINANCIAL SECURITIES LITIGATION.**

**M.D.L. No. 161.**

United States District Court,
S. D. California.

June 24, 1977.

Milberg & Weiss, New York City, for plaintiffs in Fabrikant v. Stewart, et al.

(74–282–T) and Fabrikant v. Stewart, et al. (74–283–T).

Alvin K. Hellerstein, Stroock & Stroock & Lavan, New York City, for plaintiffs in Decatur Income Fund, et al. v. Touche, Ross & Co., et al. (74–284–T), Lutheran Brotherhood v. Touche, Ross & Co., et al. (74–285–T), American Automobile Association, et al. v. Touche, Ross & Co., et al. (74–354–T).

Fred C. Aldridge, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., co-counsel for plaintiffs in Decatur Income Fund, et al., v. Touche, Ross & Co., et al. (74–284–T), Lutheran Brotherhood v. Touche, Ross & Co., et al. (74–285–T), American Automobile Association, et al., v. Touche, Ross & Co., et al. (74–354–T).

Dewitt A. Higgs, Joe N. Turner, Higgs, Fletcher & Mack, San Diego, Cal., co-counsel for plaintiffs in Decatur Income Fund, et al. v. Touche, Ross & Co., et al. (74–284–T), Lutheran Brotherhood v. Touche, Ross & Co., et al. (74–285–T), American Automobile Association et al. v. Touche, Ross & Co., et al. (74–354–T), Mellon Bank, N.A., v. Touche, Ross & Co., et al. (74–288–T).

Irving Morris, Cohen, Morris & Rosenthal, P. A., Wilmington, Del., for plaintiff in Penn Mart Realty Co. v. U. S. Financial, Inc. et al. (74–281–T).

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiffs in Mellon Bank, N.A., v. Touche, Ross & Co., et al. (74–288–T).

Winthrop Allegaert, Tufo, Johnston & Allegaert, New York City, for plaintiffs in Colonial Ventures, Inc., et al. v. Touche, Ross & Co., et al. (Tag-along).

S. Stewart Frazer, Dallas, Tex., for plaintiff in Great Commonwealth Life Ins. Co. v. R. H. Walter, et al. (74–287–T).

Allan J. Reniche, Sullivan, Jones & Archer, San Diego, Cal., for plaintiffs in First National Bank of Toledo, et al. v. U. S. Financial, Inc., et al. (74–286–T).

Paul Hamilton, Pacht, Ross, Warne, Bernhard & Sears, Inc., Los Angeles, Cal., for plaintiff in Foote v. R. H. Walter, et al. (73–508–S).

Crake, Ward, Whittemore, Aquirre & Seiderwurm, San Diego, Cal., for plaintiff in Risque v. Walter (73–312–T).

Richard S. Kraut, Securities and Exchange Comn., Washington, D. C., for plaintiff in Securities and Exchange Commission v. U. S. Financial, Inc., et al. (74–92–S).

Ralph W. Dau, O'Melveny & Meyers, Los Angeles, Cal., Paul A. Peterson, White, Price, Peterson & Robinson, San Diego, Cal., and Thomas N. Thomason, Cohen & Freeman, Los Angeles, Cal., co-counsel for defendant Union Bank.

Kevin J. Quinn, Rifkind, Sterling & Soloman, Inc., Beverly Hills, Cal., and J. Ronald Trost, Shutan & Trost, Los Angeles, Cal., co-counsel for defendant U. S. Financial.

Carl Robert Aron, Rubin, Baum, Levin, Constant & Friedman, New York City, and Fredman, Silverberg & Levis, Inc., San Diego, Cal., co-counsel for defendant James C. Wilson.

J. Asa Rountree, Debevoise, Plimpton, Lyons & Gates, New York City, for defendants Philip Hampton, Philip D. Reed, Edwin Singer, Thomas W. Smith, Walter N. Thayer and Whitcom Inv. Co.

Abraham G. Levin, Rubin, Baum, Levin, Constant & Friedman, New York City, for defendants H. Wilkins Crosby, William W. Fox, Dirk C. Kok, Jr., Robert M. Overall and Victor J. Schulman.

Edward W. Keane, Sullivan & Cromwell, New York City, for defendant John L. Weinberg.

Wallace R. Peck, Jennings, Engstrand & Henrikson, San Diego, Cal., for defendant Charles H. Dietz.

Gerald L. McMahon, Seltzer, Caplan, Wilkins & McMahon, San Diego, Cal., and Mitchell L. Lathrop, MacDonald, Halsted & Laybourne, Los Angeles, Cal., co-counsel for defendants Richard W. Arneson, Jr., Dennis P. Hill, A–H Properties, Bayview Inv. and Coastal Land Corp. (In SEC only).

George S. Delafield, Augustine, Delafield & Hrusoff, San Diego, Cal., for defendant George C. Coquillard.

Gary H. Giesler, Knapp, Stevens, Grossman & Marsh, Los Angeles, Cal., for defendant Angelo Adams.

McInnis, Fitzgeral, Rees & Sharkey, A Professional Corp., San Diego, Cal., Emile Z. Berman and A. Harold Frost, New York City, co-counsel for defendant David G. Leaverton.

Luke R. Corbett, Scales, Patton, Ellsworth & Corbett, San Diego, Cal., and Loren E. Weiss, Brainard, Speyer & Weiss, San Diego, Cal., for defendants Robert S. Walter and Robert H. Walter.

Robert D. Rosenbaum, Arnold & Porter, Washington, D. C., co-counsel for defendants Brown, Wood, Ivey, Mitchell & Petty.

Irwin F. Woodland and Ana Marie Stern, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Touche, Ross & Co.

Freedman, Levy, Kroll & Simonds, Washington, D. C., co-counsel for Walter P. Gribben.

Luce, Forward, Hamilton & Scripps, San Diego, Cal., for defendant Ernest C. Hickson.

Thomas C. Harden, Newby & Harden, San Diego, Cal., for defendant Robert C. Liuzzi.

Stacy L. Wallach, Tenzer, Greenblatt, Fallon & Kaplan, New York City, for defendant Robert G. Stewart.

Ronald L. Styn, Marinos & Styn, San Diego, Cal., for defendants Jiyun Nakaji, William B. Moeser and Thomas H. Nielsen.

George H. Kolb, Wynne, Jaffe & Tinsley, Dallas, Tex., for defendant Daniel N. Salerno.

J. David Black, Petty, Andrews, Tufts & Jackson, San Francisco, Cal., for defendant Richard G. Abbott.

Albert Thomson, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, Mo., for defendant First Cal. Co., Inc.

Stone & Youngberg, San Francisco, Cal., for Stone & Youngberg.

Edward W. Keane, Sullivan & Cromwell, New York City, for defendants Goldman, Sachs & Co. and Various other "Underwriter Defendants."

Paul R. Kennerson, Gibson & Kennerson, San Diego, Cal., for defendants L. L. Gordon, Bernard F. Coggan and Maurice Atschuler.

Carl J. Schuck, Brenton F. Goodrich, Overton, Lyman & Prince, Los Angeles, Cal., co-counsel for defendants John L. Weinberg, Goldman, Sachs & Co., Various other "Underwriter Defendants", Philip Hampton and Philip D. Reed, Edwin Singer, Thomas W. Smith, Walter N. Thayer and Whitcom Inv. Co.

Michael L. Kirby, Post, Kirby, Wideman & Noonan, James K. Eckmann, Robert B. Coffin, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for defendant Societe Generale de Banque.

Richard W. Millar, Jr., Millar & Heckman, Newport Beach, Cal., for defendants Consol. Equity Companies, James M. Taylor, J. L. Schram and Dickson G. Pratt.

Donovan, Leisure, Newton & Irvine, New York City, for defendant A. G. Becker, Inc.

John R. Ferguson, Cleveland, Ohio, for defendants Mosser Const., Inc., Robert H. Moyer, E. M. Otermat and Robert G. Weiler.

Friedman, Heffner, Kahan & Dysart, San Diego, Cal., for defendant Robert N. Gould.

Gary L. Fitzgerald, in pro. per., Vice President, Group Manager Swan Const., Inc.

Harold H. Litten, in pro per.

Richard Hunt, Jackson, Wyo., Robert D. Smith, La Jolla, Cal., Burton H. Alden, La Mesa, Cal., Robert B. Yerby, Metairie, La., Ellis Gravette, La Jolla, Cal., Morgan Wright, La Mesa, Cal., R. G. King & Company, Const., and Nat. Community Builders, San Diego, Cal., for defendants.

William L. O'Bryon, in pro. per.

James M. O'Hern, in pro. per.

Richard G. Abbott, in pro. per.

Mitchell L. Lathrop, Macdonald, Halsted & Laybourne, Los Angeles, Cal., for Richard A. Gant, V. Frank Asaro and Gant and Asaro, a co-partnership.

Francis F. Quittner, Special Counsel to Musick, Peeler & Garrett, Los Angeles, Cal., for the Official Creditors' Committee in the Chapter XI Bankruptcy Proceedings.

Herbert Katz, Federal Bankruptcy Court, San Diego, Cal., referee in bankruptcy proceedings.

Robert A. Seefried, Executive Atty., and Patricia D. Howard, Clerk of the Panel, Jud. Pan. Mult. Lit., Washington, D. C., David P. Curnow, Asst. U. S. Atty., San Diego, Cal., R. H. Walter, Laguna Hills, Cal., Mitchell L. Lathrop, Macdonald, Halsted & Laybourne, San Diego, Cal., Jeremy Ets-Hokin, San Francisco, Cal., William S. Lerach, Milberg & Weiss, San Diego, Cal. and Law, Nagel & Clark, Denver, Colo., for interested parties.

## MEMORANDUM OPINION AND ORDER

TURRENTINE, District Judge.

The court's proposal to strike all demands for jury trial in the U. S. Financial cases was heard on May 31, 1977. The court, taking into account the issues raised in the written memoranda submitted by the various parties, and considering the matters presented during oral argument, hereby orders all demands for jury trial in the U. S. Financial cases stricken, and directs that the cases be consolidated for trial before the court sitting without a jury.

In essence, the court has made this order because these cases are too complex to be tried before a jury. In the following discussion, the nature of the U. S. Financial cases will first be outlined; next, the scope of the litigation and the task facing the finder of fact will be considered; and finally the state of the law will be examined to determine whether the court has the power to issue this order striking the demands for jury trial.

*Nature of the Cases*

Before the year 1969, U. S. Financial (hereafter, "USF") was primarily engaged in the construction and development of single family residences throughout the United States. In subsequent years, however, USF reported that its income was derived primarily from the sale of income producing properties and from real estate financing.

USF was a big business. It was involved in large real estate developments from coast to coast. It was engaged in all aspects of the real estate development business, including construction, design, and sale of many kinds of structures; the manufacture of modular and mobile homes; the financing, through subsidiaries, of various real estate projects; and, through other subsidiaries, the issuance of policies of title insurance as an agent. Its stock and debentures were registered with the SEC and traded on the New York Stock Exchange. Its issuance of 5½% debentures alone was in the amount of $35 million. It had some 4.5 million shares of common stock issued and outstanding.

Unfortunately, USF collapsed. The SEC suspended trading in USF securities on December 5, 1972, and in 1973 USF filed for protection under Chapter XI of the Bankruptcy Act. The bankruptcy proceeding was later converted to a Chapter X action.

Ten lawsuits relating to the collapse of USF were filed here and in four other judicial districts. On June 6, 1974, the Judicial Panel for Multidistrict Litigation ordered all of these cases transferred to this district for coordinated or consolidated pretrial proceedings, *In re U. S. Financial Securities Litigation*, 375 F.Supp. 1403 (Jud. Pan.Mult.Lit.1974). Since the entry of that order, the *Great Commonwealth* case has been dismissed and eight additional lawsuits have been filed. Also a complaint by the SEC is before the court. The total number of USF cases (including the SEC case) is thus 18. A list of those 18 cases and the parties to each appears in Appendix A hereto.

To date, five classes have been certified in these cases. In the *Penn Mart* case, the class is composed of all purchasers of USF common stock between 1970 and 1972 who either held the stock on December 5, 1972, or who sold the stock and were damaged by the wrongs complained of in the complaint.

In the *Fabrikant* cases, the class consists of all those who purchased USF 5½% convertible subordinated debentures between April 1, 1971, and December 5, 1972. Both certifications were ordered on September 11, 1974. *In re U. S. Financial Securities Litigation*, 64 F.R.D. 443 (S.D.Cal.1974). The defendants appealed, but the class designations were sustained. Nos. 74–4535, 3436, and 3437, and 75–1496, 9th Cir., May 19 and July 9, 1975.

A class consisting of the holders of the USF 9% bearer debentures between April 8, 1970, and July 23, 1973, was designated in the *Societe* cases. *In re U. S. Financial Securities Litigation*, 69 F.R.D. 24 (S.D.Cal. 1975). Again, the class designations were sustained on appeal. No. 75–8344, 9th Cir., September 22 and November 3, 1975.

The issues raised in the 18 cases are primarily federal securities law violations, California securities law violations, and common law fraud. Violations of Ohio securities laws, and certain other common law claims, are also asserted. In addition to substantive claims, the complaints include allegations of vicarious liability such as conspiracy, aiding and abetting, and the controlling person doctrine.

More specifically, the 20 or so individual defendants and the 80-odd corporate or partnership defendants are accused of eleven different violations of Section 10(b), five violations of Section 13(a), and violations of other sections of the Securities Exchange Act of 1934. The defendants are also said to have violated Sections 11, 12(2) and 17 of the Securities Act of 1933. In addition, common law counts based on negligence, gross negligence, and malpractice are found in many of the complaints.

The subject matter of the litigation includes many different offerings of USF securities. For example, some of the complaints allege that the $35 million issuance of the 5½% debentures was fraudulent. Fraud is also alleged in connection with the overseas offering of the 9% debentures, the sale of 3¾% series A preferred stock and the sale of the series D convertible preferred stock. Promissory notes totaling nearly $700,000.00 are involved in some of the cases.

Each case is complicated by varying relationships between the stock offering and the party asserting the claim. For example, the *Mellon Bank* cases pertain only to those parties who held common stock or 5½% debentures. Those plaintiffs holding the debentures accuse some of the defendants in this case of violating sections 10(b) and 13(a); those plaintiffs who hold common stock exclude one defendant and assert a different count of negligence against the others. Thus, some of these cases have within them various sub-groups of plaintiffs asserting liability against various sub-groups of defendants, the cause of action asserted against each sub-group depending on the particular type of security involved.

Furthermore, the number of parties asserting claims against the defendants is not limited to the plaintiffs and the five certified classes. Many of the defendants have filed cross-claims against one another. Appendix B provides a rough summary of the cross-claims among the various defendants named in the earlier complaints.

*Scope of the Litigation*

The preceding outline will serve to give a general understanding of the types of claims involved in these cases and the number of parties appearing either as plaintiffs or as defendants. However, the actual extent of any lawsuit depends less on the number of parties or cases than on the complexity of the factual matters presented for resolution. Accordingly, those matters will now be examined.

In the cases comprising the USF litigation in this court, the complaints allege, among other things, many kinds of inaccuracies in financial statements issued by USF. A large number of these inaccuracies relate to transactions between USF and its numerous subsidiaries. Income reported by USF is said to be grossly inflated. It is alleged that improper accounting standards were used. Reported income is alleged never to have been received. Irregularities in

the way certain subsidiaries financed the projects undertaken by other subsidiaries are involved, as are the accounting standards used to report—or not report—such financing and the resulting contingent liabilities.

During the past three years, the various parties have been industriously deposing each other and the numerous witnesses involved in these cases. The transcripts of these depositions fill some 150,000 pages. It does not take much imagination to figure how many months of court time would be necessary just to read even a significant fraction of that amount of testimony out loud in the court room. In an actual trial, of course, many of the witnesses who were deposed would testify in person. It is safe to assume that such testimony would take even longer than it would take to read the deposition of that witness aloud.

It appears that upwards of five million documents have been made available for discovery at the various document depositories which the parties have created. It is certain that a significant fraction of those documents will be introduced into evidence during the trial by one or another of the various parties. The Plaintiffs' Steering Committee alone has identified nearly 12,000 documents which it presently plans to offer. Even if it be assumed that all of the defendants combined will offer no more than a like number, the court will be asked to receive a total of 24,000 documents. Not only that, but many of these documents are multipaged items such as minutes of meetings, reports, etc. Assuming an average of only four pages per document, there will be a total of 100,000 pages of documentary evidence presented to the court.

The magnitude of the task facing the fact finder will now be considered against the preceding background.

*The Fact Finder*

The time and effort necessary to read and understand 100,000 pages comes a little into focus when one realizes that such a quantity of paper forms a stack over forty feet high (as high as a three-story building).

In the alternative, one could say that such a quantity of paper would completely fill five large filing cabinets. Or, from a lawyer's perspective, reading those 100,000 pieces of paper would be like sitting down to read the first 90 volumes of the Federal Reporter, 2nd Series—including all the headnotes.

The fact finder will not only have to read, but will have to comprehend, the contents of these thousands of documents. It will have to analyze the USF accounts and the accounts of many subsidiaries, not only as they exist, but as the plaintiffs contend they should have existed. It will have to listen to, understand, and remember—throughout the trial—months upon months of highly technical and often boring testimony about various aspects of the USF accounts, including the testimony of the various expert witnesses who inevitably will be called by many of the parties to give their theories of whether the accounting standards actually used were correct, and, if not, what the correct standards should have been. After receiving and evaluating all of the evidence, the fact finder will then have to apply this mass of information to all of the asserted causes of action, each of which is based on different laws and different standards. The finder of fact must consider, separately, the evidence pertaining to each of the 100 or so defendants so as to reach a correct decision as to each. Finally, the fact finder will have to figure out which of the 100 or so defendants are liable to which of the plaintiffs, and which of those defendants are consequently liable to which of the other defendants who cross-complained, and for how much money.

The magnitude of the task for the fact finder is partially outlined by the pretrial memorandum of the Steering Committee of Plaintiffs' Counsel, recently received by the court. This document is 806 pages long, not counting the 18-page table of contents (it measures 95 centimeters in thickness). A separate 26-page witness list tells the reader that the plaintiffs intend to call, in person or by deposition or in some cases by both, a total of 241 witnesses. The plaintiffs' list of documents to be offered into

evidence is about the same length and size as the pretrial brief itself; it lists 11,729 documents. Thus, it has taken the plaintiffs more than *800* typewritten pages just to describe in outline form the issues which they plan to litigate; in order to carry out their plan of litigation, the plaintiffs will need to call nearly 250 witnesses and offer nearly 12,000 documents into evidence.

The magnitude of the task may also be defined by way of comparison to the state cases. There is a related set of USF cases involving the same subject matter and many of the same parties, although on a much smaller scale, now in trial in the Superior Court of the State of California, in and for the County of San Diego. The trial began on March 28, 1977. As of June 22, 1977, nearly three months later, twenty out of the 55 witnesses to be called by the plaintiffs have testified. Thirteen of the 24 plaintiffs have testified. Needless to say, the defendants have not yet begun to produce their witnesses. At its present rate, the trial will continue until early November, 1977, just to complete the plaintiffs' case. Obviously the original estimate of a trial time of three to five months now appears to be totally inadequate. Although there were four alternate jurors, it has already become necessary to excuse two of them.

In view of the enormous job facing the fact finder in the trial of these cases, the court has questioned whether a jury—any jury—is equal to the task. Accordingly, the question of whether the law permits a choice or whether it compels a jury trial, given that a timely demand therefor has been made, will be discussed next.

*The Seventh Amendment and its Limits*

Our law has always strongly favored trial by jury in most kinds of cases. The Seventh Amendment guarantees the right to trial by jury "in suits at common law, where the value in controversy shall exceed twenty dollars." Mr. Justice Story explained and gave substance to the meaning of the Seventh Amendment in *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447, 7 L.Ed. 732 (1830), where he wrote:

In a just sense, the [Seventh Amendment] then, may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights.

The question is whether the USF cases come within the purview of the Seventh Amendment so as to guarantee the parties to these cases the jury trial which many of them have demanded. According to the *Parsons* case, the answer is in the affirmative unless equity jurisdiction is available.

The classification of the USF cases as "legal" or as "equitable" is a difficult task. A brief glimpse at the law of England will be helpful as a starting point, because the whole concept of trial by jury comes to us from our English legal heritage.

In modern English practice, the jury in civil trials has all but disappeared by virtue of Parliamentary decree. However, long before the statutory curtailment of the civil jury, the English courts were denying jury trials in cases which were too complex to be tried to juries; the English judges evidently were of the opinion that in complex cases only a judge could render a fair decision. Such cases, accordingly, were tried in equity rather than at law. For example, in *Wedderburn v. Pickering*, 13 Ch.D. 769 (1879), Jessel, M. R., quotes with approval the restatement of the "old" rule found in *Clarke v. Cookson*, 2 Ch.D. 746 (1875), to the effect that some cases are "from great complexity, or otherwise, not capable of being conveniently tried before a jury." And in *Clench v. Tomley*, Cary 23, 21 Eng.Rep. 13 (1603), a case which turned primarily upon the interpretation of 60-year-old documents, Lord Egerton denied a jury trial because the dispute was

to be discerned by books and deeds, of which the Court was better able to judge then [sic] a jury of ploughmen, notwithstanding that exceptions were alleged against those ancient writings; . . .

Thus, since long before the American Revolution, the common law recognized that the sheer complexity of a case, in par-

ticular a case which involved many complicated documents, was sufficient grounds to deny a jury trial; this concept is now expressed in the statutes of England.

As early as 1805, the same rule was applied in the United States in the case of *Ludlow v. Simond*, 2 Caines Cases 1, 2 N.Y. Common Law Rep. 747, 760–761 (1805). More recently, in *Bennett v. United Lumber and Supply Co.*, 110 Conn. 536, 148 A. 369 (1930), the court said (110 Conn. at 537–538, 148 A. at 369):

> [This is] an action for an accounting involving many charges and credits between the parties aggregating upwards of $50,000.00. The trial was a protracted one; the account a difficult one to unravel. The printed evidence consists of 366 pages of the record, while there were introduced in evidence 64 exhibits. No action for an accounting, or one of this character, should be tried to the jury. It imposes upon a jury an impossible task, to expect them to carry in memory the details of a case of this character. It is unfair to a litigant to have his case determined by a tribunal which cannot fulfill that duty with accuracy or justice, however intelligent and desirous of doing their full duty the tribunal may be.

*See*, also, The Pound Conference, 70 F.R.D. 79, "Complex Civil Litigation—Have Good Intentions Gone Awry?", Francis R. Kirkham, 70 F.R.D. 199, 209, recognizing the Court's "traditional equity power, *unaffected by the Seventh Amendment*, to dispense, in their discretion, with juries in complex cases." (Emphasis added)

The Supreme Court has expressly recognized the equitable power of the courts to try complex cases in equity and dispense with a jury. In *Kirby v. Lake Shore & Michigan Southern Ry.*, 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569 (1887), the court said:

> The case made by the plaintiff is clearly one of which a court of equity may take cognizance. The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult,

if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion . . . . 1 Story Eq.Juris. § 451. Justice could not be done except by employing the methods of investigation peculiar to courts of equity.

In *United States v. Bitter Root Development Co.*, 200 U.S. 451, 26 S.Ct. 318, 50 L.Ed. 550 (1906), the Supreme Court rejected the plaintiff's attempt to bring an action at law on the equity side of the court because the lawsuit involved was really no more than an action in trespass. The Court again recognized, however, that the complexity of a case was a factor which would warrant the assumption of equitable jurisdiction. In referring to *Kendall, Administratrix of Green v. Creighton*, 64 U.S. (23 How.) 90, 16 L.Ed. 419 (1860), a case in which equity jurisdiction was approved, the first item listed by the Court which warranted equity jurisdiction in the *Kendall* case was: "the facts were complicated." (200 U.S. at 475, 26 S.Ct. 318).

In *Bitter Root*, the Court also held that difficulty of proof was not enough to confer equity jurisdiction. This rule was approved in *Curriden v. Middleton*, 232 U.S. 633, 636, 34 S.Ct. 458, 459, 58 L.Ed. 765 (1914). Although it was urged that the facts in *Curriden* were complicated, the Court disagreed and said "and further, mere complication of facts alone and difficulty of proof are not a basis of equity jurisdiction." Accordingly, it takes something more than the "mere" complication of facts to confer equity jurisdiction. It remains to determine what that "something" is and to decide whether it is present in the USF cases.

## Complexity and Equity Jurisdiction

In recent years, the Supreme Court has on several occasions addressed the extent of the right to trial by jury. In *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510–511, 79 S.Ct. 948, 957, 3 L.Ed.2d 988 (1959), the Court held that in a case presenting *both* legal *and* concededly equitable issues,

only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims.

The Court did not address the problem of how to decide whether a case has become so complex as to create equitable jurisdiction; it dealt with issues the legal or equitable nature of which was not in dispute.

In *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478, 82 S.Ct. 894, 900, 8 L.Ed.2d 44 (1962), the original plaintiff had filed a lawsuit in which an "accounting" was demanded. The Court found that in fact the complaint was really nothing more than an action on a contract, or in the alternative a trademark infringement case, and had this to say about equitable jurisdiction in complex cases (relying in part on *Kirby, supra*):

> The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres*, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit [in equity] on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the "accounts between the parties" are of such a "complicated nature" that only a court of equity can satisfactorily unravel them.

■ The basis for granting equity jurisdiction over cases of extraordinary complexity is, of course, the inadequacy of the legal remedy, or more specifically, the inability of the jury to handle the case and render a fair decision, as the Court noted in *Dairy Queen*. Recently the Court had occasion to formulate a test which is to be used in deciding whether a case is legal or equitable in nature. One part of the test is whether a jury is capable of rendering such a decision; if it is not, then the case should be tried in equity by the court without a jury. The test is found in *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), at page 538, n. 10, 90 S.Ct. at page 738:

the "legal" nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries.

The problem of when a case becomes so complex as to be beyond the abilities of a jury to decide was carefully considered by the District Court in *Goffe & Clarkener, Inc. v. Lyons Milling Co.*, 26 F.2d 801 (D.Kan.1928), *aff'd*, 46 F.2d 241 (10th Cir. 1931). The court there, after a careful review of the existing authorities including *Kirby*, concluded that (page 804)

> while mere difficulty of proof is not sufficient to confer jurisdiction upon equity, yet if the action is one for an accounting, and the account presented is so difficult, complicated and confusing that a jury cannot handle it, an action may properly be brought in equity for the purpose of taking the accounting. But the field is a narrow one.

In *Tights, Inc. v. Stanley*, 441 F.2d 336 (4th Cir. 1971), the court, relying on *Bitter Root*, distinguished complicated issues of *liability* from complicated issues of *damages*. However, the *Tights* court recognized that in some cases the complex issues might arise during the liability part of the trial, and said that in its opinion the Supreme Court would have to decide whether such complex cases could be tried in equity rather than by a jury.

■ In *Ochoa v. American Oil Co.*, 338 F.Supp. 914, 921 (S.D.Tex.1972), the court, without limiting its reasoning to the damages part of a trial, said

> In an extraordinary case, the complexity of issues may be so great that only a court of equity may unravel them, thus implying an inadequate remedy at law. It is easier to state this principle than to hypothesize a case in which it would apply.

The court there questioned the propriety of inquiring into the abilities of juries, but conceded that such inquiries are occasionally made by the courts. In view of the holding in *Ross*, however, this court does

not believe it inappropriate to make such an inquiry.

Finally, at least one court has decided that a modern case is so complex as to warrant striking timely demands for jury trial. The case is *In re Boise Cascade Securities Litigation*, 420 F.Supp. 99 (W.D.Wash. 1976). There are many similarities between the *Boise* cases and the USF cases, although a review of the facts in *Boise* will show that the USF cases in many respects are even more complex than the *Boise* cases. The essential similarity between the two cases, however, is the presence of complicated accounting problems. The *Boise* court described these problems as follows (420 F.Supp. at page 103):

> Finally, and most important, in order to determine whether liability exists, the fact finder will have to analyze the Boise accounting, not only of the accounts as they existed at the time of the merger, but as the plaintiffs claim they should have existed. It is anticipated that experts for each side will have to go through the accounting techniques and resulting figures in each of the areas complained of in [the complaint]. In all, *assets and liabilities in excess of a billion dollars are involved and a period of more than five years will have to be examined.* (Emphasis in original)

> . . . . .

> Competing theories of accounting will be presented for all of these matters. It has been suggested that more than one "generally accepted accounting principle" can be applied to a particular bookkeeping problem but that not all of those principles fairly reflect the financial condition of the corporation.

> In sum, it appears to this Court that the scope of the problems presented by this case is immense. The factual issues, the complexity of the evidence that will be required to explore those issues, and the time required to do so leads to the conclusion that a jury would not be a rational and capable fact finder.

■ From the above cases, some general guidelines can be established for deciding whether a particular case is so complex that equity jurisdiction will attach and permit the case to be tried without a jury.

First, although mere complexity is not enough, complicated accounting problems are not generally amenable to jury resolution. Although such problems often arise only during the damages portion of a trial, they sometimes are present during the liability portion as well. Also, given the comments in *Dairy Queen* regarding special masters, only a case in which such a special master could not assist the jury meaningfully may be subject to removal from the province of the jury because of complex accounts.

Second, the jury members must be capable of understanding and of dealing rationally with the issues of the case.

And third, an unusually long trial may make extraordinary demands upon a jury which would make it difficult for the jurors to function effectively throughout the trial.

*Problems with Accounts*

■ In applying the first of these guidelines to the USF cases, some general comments about accounting and equity are in order. In essence, a typical accounting case appearing before the equity courts of old would have involved the records of transactions by an agent or fiduciary on behalf of his principal. Another such case might have included a demand by one partner in a partnership for an explanation of the way the other partner accounted for the firm's financial affairs. The primary task—in some cases, the only task—to be performed by the court in these cases was to reconcile the accounts and determine from them how much money was due from the one party to the other. Sometimes, of course, the *existence* as well as the *amount* of a liability would depend on the accounting. But in all of these cases, the common sense; the community standards; and even the knowledge of the facts, in the earliest cases; which the jury brought into the courtroom and with which the evidence was to be evaluated were of little or no use in performing what was essentially a bookkeeping operation.

Indeed, not only did the jury not have anything positive to contribute to the decision of such cases, but in fact the jurors were often incapable of understanding what the cases were all about. For example, in *Clench v. Tomley, supra*, which did not even involve accounts but which *did* require an ability to read the printed word, the court quite understandably was unwilling to permit a jury of "ploughmen"—that is, a jury of illiterates—to make the fact finding decisions.

It would seem obvious, if two parties have a dispute the resolution of which hinges on the meaning of a document, that they would not expect someone who cannot read to be capable of achieving an intelligent and fair resolution of the dispute. Likewise, it would seem obvious, if two parties have a dispute the resolution of which hinges on the accounts between the parties, that they would not expect an intelligent and fair resolution of the dispute from someone who does not understand accounting. They would want someone who understands accounts, and who will patiently take the time to go through their records so as to put the accounts in order, to render the decision. Thus, in the days when jury members could not read, it was no more than common sense for the common law to recognize that its juries could not provide an adequate remedy to those litigants whose disputes primarily involved documents. In the days when jury members could not understand arithmetic, it was no more than common sense for the common law to acknowledge that its juries could not provide an adequate remedy to those litigants whose disputes primarily involved accounts—even comparatively simple accounts. And in more modern times it is no more than common sense for the law to recognize that modern juries are not capable of providing an adequate remedy to those litigants whose disputes involve accounting of complicated commercial transactions (*e. g., Kirby, supra* ).

A study of the allegations of the parties to the USF cases shows that accounting problems of the most intricate kind lie at the very heart of the cases. A review of the pleadings alone gives an idea of the scope of these problems, and the pre-trial brief submitted by the plaintiffs brings them more into focus.

The trier of fact will first have to familiarize itself with the USF accounts as they presently exist. These accounts, which go back a number of years, include, *inter alia* :

a) Complex real estate transactions. There were many intricate purchases and sales of large parcels of real estate. Large construction projects were undertaken. The financing of the purchases and of the construction projects often involved a series of loans among various USF subsidiaries. Sometimes there would be a series of purchases and sales with each subsidiary involved in the deal reporting a profit on its share of the transaction.

b) Reporting of income. Income reported was not always represented by cash in the bank. Income and profits from a variety of sources and in a variety of forms were reported. Sometimes the income was to be realized at a future date.

c) Securities. USF bought and sold securities of some of its subsidiaries. The value of those securities, and the net worth of those subsidiaries, hence would be of importance. These figures, in turn, would be affected by some of the other matters listed above.

Merely to understand the USF accounts —covering, as they do, such an extended period of years and including all aspects of such a large business—will be a sizable undertaking. But the trier of fact will not only have to understand the accounts, but will have to decide whether they accurately reflect the financial condition of USF and of its many subsidiaries at various points in time. As the *Boise* court noted, conflicting accounting theories will be presented as to how these very involved accounts should have been reported. The trier of fact will have to decide whether "income" reported by a given subsidiary was correctly reported, whether it should have been reported partially as future income, and if so in what proportion to current income, whether that

report of income affected the net worth of USF, if so how much, and so on for many intricate transactions.

The court believes that jury members are singularly unqualified to study, untangle, and make comprehensible the USF accounts because the accounts are so complicated and because there are so many uncertainties as to correct accounting standards, proper application of those standards, etc. Throughout the process of accounting which the fact finder must complete are decisions and value judgments which must be made. It would not be feasible for a special master to list the figures and then have a jury apply those figures to the balance of the evidence. In the USF cases, the accounts are so central to the ultimate issues of the cases and so pervasive throughout all aspects of the cases, that the trier of fact must be someone who is capable of understanding and rationally reconciling the mass of data which will be presented during the trial.

The court thus concludes that the first guideline is satisfied. The accounting problems presented by the USF cases are so central to the ultimate issues in the cases as to make unrealistic a plan for having one or more special masters perform the accounting for the jury. The accounts are of the type which historically have been adjudicated in equity because juries cannot properly deal with them. Since the first guideline suggests the propriety of court trial of the USF cases, an examination of the other guidelines will next be undertaken.

*The Laws Applicable*

As has already been noted, liability has been asserted against various defendants under numerous different Federal laws and under the laws of at least two states. The court has grave doubts of the ability of a jury to comprehend, and deal rationally with, a set of cases in which the number of plaintiffs here present are suing the number of defendants here present, under the variety of legal theories here advanced, and with the number of counterclaims here asserted. It should not be necessary to recite again the figures or to attempt to explain the numerous theories of recovery. The Appendices hereto will show how complex the interrelationships of the various parties are, and the complaints illustrate the variety of legal theories in existence. The court does not believe that a jury can rationally cope with a case of this complexity even aside from the incredibly difficult accounting problems already discussed. Accordingly, the second guideline is also satisfied.

*The Third Guideline*

It is not unlikely that the trial in the USF cases will last for two years or more, according to estimates of counsel. In view of the progress of the much simpler proceeding in state court, the estimate of two years appears entirely reasonable. But can a jury be chosen that could sit for such a long trial?

One of the factors which *Ross v. Bernhard, supra,* listed as governing the right to jury trial is the "practical limitations" of jurors. Although the preceding discussion might well be thought to constitute a consideration of just such limitations, the length of a trial gives rise to a study of different kinds of limitations inherent in a jury trial.

First, of course, will be the difficulty in selecting a jury at all. Any experienced trial judge knows that there is an enormous difference between asking an average citizen to sit for a few days or even for a few weeks on a jury, on the one hand, and asking the same citizen to sit for two years on the other hand. It would be unconscionable to demand of any gainfully employed person—even a civil servant, who normally will be excused from his regular duties to participate as a juror—that he abandon his career for two years. Few employers would tolerate such a period of absence; few careers would not be materially and permanently retarded in terms of promotions, seniority, maintenance of professional proficiency, etc., by such a long absence. The housewife who does not have small children, while often entirely willing to sit for shorter cases, would likely be unwilling to leave her husband and family to the care

of others for such a time. Even a retired person might well be unwilling to undertake what would amount to a permanent job during the years which he had planned to spend fishing or in other such pursuits. The court is firmly convinced that it would be intolerable for a two-year tour of duty to be imposed upon anyone who is unwilling to assume it; and the court does not believe that very many can be found who will be willing to serve for two years.

Even assuming that an acceptable (to the parties) jury panel can be found, there are difficulties which are bound to arise during a two year period which simply do not cause problems in a shorter trial, even a trial of several months duration. For example, jurors of advanced age might die before the trial ended. A housewife might have to accompany her husband to a new job in a distant city. Jurors might have to attend family funerals, might become ill, might become pregnant, etc. The list could go on, but it should already be sufficient to make the point: enough unforeseen things are likely to happen during a two-year period as to make it very difficult to begin a jury trial with any realistic assurance that the jury will still exist two years in the future.

For these reasons the court believes that a two-year jury trial is, of itself, beyond the practical limitations of the human beings who would be asked to serve.

*Conclusion*

All of the guidelines distilled from the cited authorities suggest that the USF cases should not be tried to a jury. Accordingly, the court finds that the USF cases come within the equity powers of the court, and the court will proceed to try the cases without a jury.

█ It has been suggested that the cases be severed and returned to their respective districts for separate trials. However, if the 18 cases are tried separately, the cases would have to be staggered over a 12 to 18 year period because many critical parts of the proof in the various cases are the same and because the evidence will come for the most part from the same witnesses. It would be grossly unfair to the plaintiffs, if they have been wronged, or to the defendants, if they have done no wrong, for such a period of time to elapse before these cases come to a close and appropriate remedies are effected. Therefore, to conserve judicial time and in fairness to the plaintiffs as well as to the defendants, these cases shall be tried as a consolidated case.

The court wishes to emphasize that it has not lightly made the decision to strike the jury demands in these cases. This court has had some ten years of experience as a trial court and during that time has presided at more than 300 jury trials, both criminal and civil. The court is a firm believer in the jury system and, time and again, has expressed its confidence in the abilities of juries to reach just decisions. It is precisely because of this experience, however, that the court realizes the limitations of juries and has reached the conclusion that a jury could not fairly try the USF cases.

Assuming that these cases proceed to court trial, many devices are available to assist the court in reaching a just resolution of the controversy. Special masters can be appointed to review and organize the documentary evidence, the depositions, and the testimony of the various witnesses. A schedule could be adopted providing three days per week of actual trial and a fourth day for conference between the judge and the special masters to review and study the evidence presented during that week. Daily transcripts can be prepared and used during the weekly review. Such methods as these are easy to use if the trial is to the court, but are well-nigh impossible to use in a jury trial.

The court is mindful of the point argued by some of the parties to the effect that the pre-trial briefs and the pre-trial proceedings now in progress may simplify these cases enough so that a jury could cope with them. If such a state of affairs comes about, the court will reconsider this order. However, in order to avoid delays close to the time of trial, it is imperative to proceed now to resolve the jury trial issue.

The court recognizes the possibility that an appellate court will take a different view of the issues raised in this order. It would be a tragedy to undertake the enormous expense and effort on the part of the parties and the court of conducting a trial of this case only to have an appellate court later invalidate the entire proceeding because a jury should have been used. Therefore, the court hereby certifies the question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The question is of overriding importance to the litigation. It is a controlling question as to which there is likely to be a substantial difference of opinion. Resolution of the question before trial will materially advance termination of the litigation because it will avoid the possibility of a re-trial because of this issue.

Merely the logistical problems presented by a jury trial of these cases—given the number of counsel and parties involved—are immense. The court is uncertain as to where to find a courtroom large enough to accommodate 18 to 30 attorneys for the plaintiffs and 50 to 55 attorneys for the defendants—not to mention the parties themselves and, last but not least, the jurors and the many alternate jurors that will of course have to be present.

Because it would be so unfair to undertake the trial of this case under the threat of appellate reversal, the court will conclude that any party which does not proceed with interlocutory appeal at this time has waived its right to do so later and has withdrawn its demand for trial by jury.

To eliminate or minimize any possibility of delay resulting from this order, the court will retain jurisdiction of these cases (except for the jury trial issue) and the parties will proceed in accordance with the pretrial schedule now in existence.

Accordingly,

IT IS ORDERED that all demands for jury trial filed in the USF cases are hereby stricken.

IT IS FURTHER ORDERED that this order is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

IT IS FURTHER ORDERED that any party failing to avail itself of the opportunity for interlocutory appeal, or failing to timely seek mandamus as to this order, shall be deemed to have waived any objections it may have thereto and shall be deemed to have withdrawn it request for jury trial.

IT IS FURTHER ORDERED that in all other respects the court will retain jurisdiction of these cases and that the parties shall submit their pretrial briefs and in all other respects comply with the existing pretrial schedule.

Appendix A

List of Consolidated USF Cases

Case No: 73-312

Plaintiff: John Risque

Defendant: Robert Walter

Case No: 73-508

Plaintiff: William Foote

Defendants: R. H. Walter, W. W. Fox, D. C. Kok, P. Hampton, R. M. Overall, V. J. Schulman, T. W. Smith, W. N. Thayer, J. L. Weinberg, J. B. Halverson, R. G. Stewart, H. W. Crosby, C. N. Mosser, P. D. Reed, E. Singer, R. S. Walter, D. G.

Leaverton, E. C. Hickson, E. T. Gravette, D. C. Cook, G. Coquillard, W. A. Stenson, C. Dietz, Morgan Wright, Touche Ross & Co., Richard C. Engleberg, Richard E. Herrinton, John J. Malkind, Ruth Chapin, Glen A. Olson, Union Bank, U. S. Financial, and Harold Turner.

Case No: 74-281

Plaintiff: Penn Mart Realty

Defendants: U. S. Financial, Touche Ross & Co., H. W. Crosby, W. W. Fox, P. Hampton, E. C. Hickson, J. B. Halverson, D. C. Kok, R. M. Overall, P. D. Reed, V. J. Schulman, E. Singer, T. W. Smith, R. G. Stewart, W. N. Thayer, R. S. Walter, R. H. Walter, J. L. Weinberg, D. G. Leaverton, A-H Properties, R. W. Arneson, D. Hill, Bay View Investments, W. P. Gribben, C. Prutzman, Coastal Land Corp., W. O'Bryon, Consolidated Equity Companies, J. L. Schram, D. G. Pratt, J. M. Taylor, R. G. and V. F. Asaro, R. G. King, P. Mitrovich, J. Ets-Hokin, National Community Builders and Union Bank.

Case No: 74-282 and 74-283

Plaintiffs: Michael Fabrikant and Milton Binswanger

Defendants: Touche Ross & Co, Goldman Sachs & Co, Argio Capital Corp, Arnhold & S. Bieichroeder Inc, Bache & Co, Basle Securities Corp, Bateman Eichler Hill Richards, Inc, Bear Stearns & Co, A. G. Becker & Co, Bender Co, Blyth & Co, Boettcher & Co, Blunt Ellis & Simmons, Inc, J. C. Bradford & Co, Burnham & Co, Butcher & Sherrerd, CBWL-Hayden Stone Inc, Cazenove Inc, Clark Dodge & Co, Crowell Weedon & Co, Dain Kalman & Quail Inc, Davis Skaggs & Co, Doft & Co, Dominick & Dominick, Inc, du Pont Glore Forgan Inc, First California Co, Eastman Dillon Union Securities & Co, Equitable Securities Morton & Co, Ferris & Co, The First Boston Corp, Gutzwiller Kurz Burgener Securities Limited, Hambrecht & Quist, Hornblower & Weeks-Hemphill Noyes, William Hutchinson & Co, E. F. Hutton & Co, Kidder, Peadbody & Co, Kleinwort Benson Inc, Kohlmeyer & Co, Lazard Freres & Co, Lehman Bros Inc, Loewi & Co, McDonald & Co, Merrill Lynch, Pierce, Fenner & Smith Inc, Mitchum, Jones & Templeton Inc, Model Roland & Co, New York Hanseatic Corp, John Nuveen & Co, The Ohio Company, Oppenheimer & Co, Paine, Webber, Jackson & Curtis Inc, Paribas Corp, H. O. Peet & Co, Pierson Heldring & Pierson, Piper Jaffray & Hopwood, Inc, R. W. Pressprich & Co, Rauscher Pierce Securities Corp, Reynolds & Co, Roberts Scott & Co, The Robinson-Humphrey Co, L. F. Rothschild & Co, Salomon Bros, Scherck Stein & Franc Inc, Shearson, Hammill & Co, Shields & Co, Shuman Agnew & Co, I. M. Simon & Co, Singer & Friedlander Limited, Singer Deane & Scribner, Smith Barney & Co, Societe Generale de Banque S.A., Stern Frank Meyer & Fox, Inc, Stone & Youngberg, Strauss Turnbull & Co, Sutro & Co, Thomson & McKinnon Auchincloss Inc, Walston & Co Inc,

Watling Lerchen & Co, Wertheim & Co, Dean Witter & Co, Wood Struthers & Winthrop Inc, R. H. Walter, J. B. Halverson, R. G. Stewart, D. C. Kok, H. W. Crosby, W. W. Fox, R. M. Overall, P. D. Reed, V. J. Schulman, E. Singer, T. W. Smith, W. N. Thayer, J. L. Weinberg, J. G. Wilson, E. C. Hickson, W. B. Moeser, T. H. Nielsen, R. S. Walter, D. G. Leaverton, J. Nakaji, C. H. Dietz, G. L. Fitzgerald, P. Hampton, R. B. Yerby, R. D. Smith, H. H. Litton, C. M. Mosser, R. G. Abbott, Union Bank, U. S. Financial, W. L. O'Bryon, W. P. Gribben, R. W. Arneson, D. Hill, A-H Properties, R. Gant, V. F. Asaro, G. A. Einhorn, R. B. Hunt, Whitcom Investment, and C. Prutzman.

## Case No: 74-284, 74-285 and 74-354

Plaintiffs: Decatur Income Fund, Inc, Colonial Convertible Fund, Inc, Commerce Bank of Kansas City, First National Bank in Dallas, North Carolina National Bank, Lutheran Brotherhood, American Automobile Association, Armed Forces Relief & Benefit Association, Memphis Light Gas and Water Division Retirement and Pension System, International Brotherhood of Painters and Allied Trades, AFL-CIO (Death Benefit Fund), International Brotherhood of Painters and Allied Trades (General Officers and General Representatives Retirement and Pension Fund), and Guaranty Trust Co.

Defendants: Same as for Case No. 74-282.

## Case No: 74-286

Plaintiffs: First National Bank of Toledo, V. A. Mosser, C. N Mosser, and Janet M. Sweeney.

Defendants: Touche Ross & Co, R. H. Walter, J. B. Halverson, R. G. Steward, R. G. Abbott, D. C. Kok, R. N. Gould, W. B. Moeser, G. L. Fitzgerald, L. L. Gordon, B. H. Alden, B. G. Coggan, H. W. Crosby, J. Elman, M. Erskine, W. W. Fox, J. M. O'Hern, R. M. Overall, V. J. Schulman, J. G. Wilson, T. W. Smith, W. N. Thayer, J. L. Weinberg, E. C. Hickson, R. S. Walter, J. Nakaji, T. H. Nielsen, P. D. Reed, C. H. Deitz, E. Singer, Whitcom Investment Co, Goldman Sachs & Co, First California Co, Inc, Burnham Management Co, Union Bank, M. Altshuler, C. Prutzman, R. W. Arneson, D. P. Hill, W. P. Gribb W. L. O'Bryon, A-H Properties, Bayview Investments, R. G. King and A. Adams.

## Case No: 74-288

Plaintiffs: Mellon Bank and John S. Renkerk.

Defendants: Touche Ross & Co, U. S. Financial, Union Bank, Goldman Sachs & Co, Salomon Bros, Dean Witter & Co, Lehman Bros, Drexel Burnham & Co, Gant & Asaro, A-H Properties, R.

**718**

H. Walter, J. B. Halverson, R. G. Stewart, D. G. Leaverton, R. G. Abbott, C. H. Dietz, G. L. Fitzgerald, D. C. Kok, H. W. Crosby, W. W. Fox, R. M. Overall, P. D. Reed, V. J. Schulman, E. Singer, T. W. Smith, W. N. Thayer, J. L. Weinberg, J. G. Wilson, P. Hampton, R. D. Smith, C. Prutzman, R. W. Arneson, D. Hill, W. P. Gribben, W. O'Bryon, R. Gant, F. Asaro, and R. B. Hunt.

Case No: 74-436

Plaintiffs: Colonial Ventures and Colonial Equities.

Defendants: Touche Ross & Co, Union Bank, R. H. Walter, R. S. Walter, J. B. Halverson, R. G. Stewart, D. G. LEaverton, R. G. Abbott, C. H. Dietz, G. L. Fitzgerald, D. C. Kok., H. W. Crosby, W. W. Fox, R. M. Overall, P. D. Reed, V. J. Schulman, E. Singer T. W. Smith, W. N. Thayer, J. L. Weinberg, J. G. Wilson, P. Hampton, R. D. Smith, C. M. Mosser, J. Nakaji, E. D. Hickson, H. H. Litton, W. B. Moeser, R. B. Yerby, T. H. Nielsen, A-H Properties, R. W. Arneson, D. P. Hill, Bay View Investments, W. P. Gribben, C. D. Prutzman, Coastal Land Corp, W. L. O'Bryon Consolidated Equity Companies, J. L. Schram, D. G. Pratt, J. M. Taylor, R. Gant, V. Frank Asaro, R. G. King, Predrag Mitrovich, J. Ets-Hokin, and National Community Builders.

Case No: 74-569

Plaintiffs: Societe Generale de Banque, Rentinvest, North American Fund A, and ITF Fund, Ltd.

Defendant: Touche Ross & Co.

Case No: 75-1044

Plaintiffs: Societe Generale de Banque, Rentinvest, North American Fund A, and ITF Fund, Ltd.

Defendant: Union Bank.

Case No: 76-819

Plaintiffs: Societe Generale de Banque, Rentinvest, North American Fund A, and ITF Fund, Ltd.

Defendant: Brown, Wood, Fuller, Caldwell & Ivey and Brown, Wood, Ivey, Mitchell & Petty.

Case No: 74-452

Plaintiff: R. G. Stewart.

Defendants: Touche Ross & Co, Union Bank, U. S. Financial, and R. H. Walter.

Case No: 75-1107

Plaintiff: William H. Huff

Defendant: Touche Ross & Co

Case No: 75-1119

Plaintiff: Robert D. Kelce

Defendants: Touche Ross & Co, and Union Bank.

Case No: 74-92 [Not part of the M.D.L. docket]

Plaintiff: Securities and Exchange Commission

Defendants: USF, R. H. Walter, J. B. Halverson, C. D. Prutz-man, R. W. Arneson, D. P. Hill, W. P. Gribben, W. L. O'Bryon, A-H Properties, and Bayview Investments.

Appendix B

Cross-Complainants

The following plaintiffs filed the first of the USF' lawsuits. In this appendix, each case is identified by the name of the plaintiff, as follows:

1. Risque

2. Foote

3. Great Commonwealth [complaint has been dismissed]

4. Penn Mart Realty

5. Fabrikant and Binswanger

6. Decatur Income Fund, et al.

7. First National Bank of Toledo

8. Colonial Ventures

9. Mellon Bank

For convenience, some defendants have been arranged into the following groups:

A-H Group:

A-H Properties
R.W. Arneson
Bayview Investments*
Coastal Land Corp.*
D.P. Hill

Goldman Group:

Dean Witter
Drexel, Burnham
Goldman Sachs
Lehman Bros.
Salomon Bros.

Kok Group:

D. C. Kok
H. W. Crosby
W. W. Fox
P. Hampton*
R. M. Overall
P. D. Reed
V. J. Schulman
E. Singer
T. W. Smith*
W. N. Thayer
J. L. Weinberg*

*Not a part of the group in some of the cases.

| PLAINTIFFS | DEFENDANTS | CROSS-COMPLAINANTS |
|---|---|---|
| Risque | R. H. Walter | A-H Group |
| Foote | | First Calif. Co. |
| Great Com. | | Goldman Group |
| Penn Mart | | Halverson |
| Fabrikant | | Kok Group |
| Decatur | | O'Bryon |
| First Natl. | | Stewart |
| Colonial | | USF |
| Mellon | | Touche Ross |
| | | Union Bank |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPENDIX B—Continued

| PLAINTIFFS | DEFENDANTS | CROSS-COMPLAINANTS |
|---|---|---|
| Foote<br>Penn Mart<br>Fabrikant<br>Decatur<br>First Natl.<br>Colonial<br>Mellon | Union Bank | A-H Group<br>First Calif. Co.<br>Goldman Group<br>Halverson<br>Kok Group<br>O'Bryon<br>Stewart<br>USF |
| | Touche Ross | First Calif. Co.<br>Goldman Group<br>Kok Group<br>Leaverton<br>Halverson<br>Stewart<br>USF<br>R. H. Walter |
| Foote<br>Penn Mart<br>Fabrikant<br>Decatur | USF | Halverson<br>Leaverton<br>Stewart<br>Touche Ross |
| Foote<br>Great Com.<br>Penn Mart<br>Fabrikant<br>First Natl.<br>Colonial | R. S. Walter | A-H Group<br>First Calif. Co.<br>Goldman Group<br>Halverson<br>Kok Group<br>Stewart<br>USF |
| Foote<br>Penn Mart<br>Fabrikant<br>Decatur<br>First Natl.<br>Colonial | Hickson | Halverson<br>Stewart<br>USF |
| Great Com.<br>Penn Mart<br>Fabrikant<br>Decatur<br>First Natl.<br>Colonial<br>Mellon | Halverson | First Calif. Co.<br>Goldman Group<br>A-H Group<br>Kok Group<br>O'Bryon<br>Stewart<br>USF |
| | Kok Group | Halverson<br>Leaverton<br>Stewart<br>USF |

722

| PLAINTIFFS | DEFENDANTS | CROSS-COMPLAINANTS |
|---|---|---|
| | Stewart | A-H Group<br>First Calif. Co.<br>Goldman Group<br>Kok Group<br>O'Bryon<br>USF |
| Great Com.<br>Penn Mart<br>Decatur<br>Colonial<br>Mellon | Leaverton | A-H Group<br>Goldman Group<br>First Calif. Co.<br>Kok Group<br>Stewart<br>USF |
| Penn Mart<br>First Natl.<br>Colonial<br>Mellon | Gribben | First Calif. Co.<br>Kok Group<br>Goldman Group<br>Stewart<br>USF |
| Penn Mart<br>Colonial | Ets-Hokin<br>Mitrovich<br>National Comm. Bldg.<br>Consolidated Eq.<br>Schram<br>Taylor<br>Pratt | Kok Group<br>Stewart<br>USF |
| Penn Mart<br>First Natl.<br>Colonial | King | First Calif. Co.<br>Goldman Group<br>Kok Group<br>Stewart<br>USF |
| Penn Mart<br>Fabrikant<br>Decatur<br>First Natl.<br>Colonial | O'Bryon | First Calif. Co.<br>Goldman Group<br>Halverson<br>Kok Group<br>Stewart<br>USF |

| PLAINTIFFS | DEFENDANTS | CROSS-COMPLAINANTS |
|---|---|---|
| | Prutzman | A-H Group<br>First Calif. Co.<br>Goldman Group<br>Halverson<br>Kok Group<br>O'Bryon<br>Stewart<br>USF |
| Penn Mart<br>Fabrikant<br>Decatur<br>First Natl.<br>Colonial<br>Mellon | A-H Group | Goldman Group<br>Weinberg<br>First Calif. Co.<br>Halverson<br>Kok Group<br>O'Bryon<br>Stewart<br>USF |
| Penn Mart<br>Colonial<br>Mellon | Gant<br>Asaro | Goldman Group<br>Kok Group<br>Stewart<br>USF |
| Fabrikant<br>Decatur<br>First Natl.<br>Mellon | Goldman Group<br>Wilson | Halverson |
| Fabrikant<br>Decatur<br>First Natl. | First Calif. Co.<br><br>Whitcom Investment | Halverson<br>A-H Group<br><br>Halverson |
| Fabrikant<br>Decatur<br>First Natl.<br>Colonial<br>Mellon | Abbot | A-H Group<br>Halverson |
| First Natl. | Adams | A-H Group |