In re U. S. FINANCIAL SECURITIES LITIGATION.

Michael FABRIKANT and Milton Binswanger, Petitioners-Appellants,

v.

BACHE & CO., Basle Securities Corp. et al., Respondents/Appellees.

FIRST NATIONAL BANK OF TOLEDO, etc. et al., Petitioners/Appellants,

v.

R. H. WALTER, J. B. Halverson, R. G. Steward et al., Respondents/Appellees.

MELLON BANK, N. A., ("Mellon") et al., Petitioners/Appellants,

v.

U. S. FINANCIAL, Salmon Bros. et al., Respondents/Appellees.

Petition of Charles D. PRUTZMAN, Jr.

Petition of UNION BANK.

Petition of TOUCHE ROSS AND COMPANY.

Petition of Angelo ADAMS.

Petition of BROWN, Wood, Ivey, Mitchell & Petty.

Petition of SOCIETE GENERALE DE BANQUE, RENTINVEST, et al.

COLONIAL GROWTH SHARES, INC., Petitioner/Appellant,

v.

TOUCHE ROSS & CO. et al., Respondents/Appellees.

Michael FABRIKANT and Milton Binswanger, Plaintiffs/Appellees,

v.

Philip HAMPTON, Philip D. Reed et al., Defendants/Appellants.

412

Michael FABRIKANT and Milton Biswanger, Plaintiff/Appellees,

v.

John WEINBERG, etc. et al., Defendants/Appellants.

Nos. 77–2993 to 77–2995, 77–3063, 77–3064, 77–3093, 77–3099, 77–3121, 77–3122, 77–3333, 77–3344 and 77–3345.

United States Court of Appeals, Ninth Circuit.

Dec. 10, 1979.

Mitchell L. Lathrop, Los Angeles, Cal., for Richard Gant & V. Frank Asaro.

Charles D. Siegal, Los Angeles, Cal., for Charles D. Prutzman.

James W. Colbert, III, Los Angeles, Cal., for Union Bank.

Robert F. Brown, for Crosby, Fox, et al.

Stephen D. Miller, Beverly Hills, Cal., for Angelo Adams.

James M. Shaughnessy, New York City, for Societe Generale de Banque etc.

J. Asa Rountree, New York City, for Philip Hampton, Philip D. Reed, et al.

Winthrop J. Allegaert, New York City, for Colonial Growth Shares, etc.

Irwin F. Woodland, Los Angeles, Cal., for Touche Ross & Co.

Before KILKENNY and ANDERSON, Circuit Judges, and BYRNE,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

This appeal presents a challenge which strikes at the heart of this country's system of jurisprudence. Simply stated, we are asked to decide whether there is a "complexity" exception to the Seventh Amendment right to a jury trial in civil cases. We answer this question in the negative and reverse the decision of the district court.

## I. *PROCEEDINGS BELOW*

U.S. Financial (USF) was a high-flying real estate development company which began losing altitude in 1972 and finally crashed in 1973. This spawned an abundance of lawsuits.[1] The present case concerns twenty separate suits filed by a variety of plaintiffs who were on the most part purchasers or representatives of purchasers of the different stock and debenture offerings made by USF.[2] The various defendants include USF, certain closely-related companies, assorted USF insiders, underwriters, outside attorneys and accountants. All of the lawsuits present common issues relating to the allegations of federal and state securities law violations, common law fraud and negligence.

The different lawsuits were filed in federal court for the Southern District of California and four other federal judicial districts. The Judicial Panel on Multidistrict Litigation found that the prevalence of common issues and allegations justified transfer of the several cases to the Southern District of California for coordinated or consolidated pretrial proceedings. *In re U. S. Financial Securities Litigation*, 385 F.Supp. 586 (Jud.Pan.Mult.Lit.1974); *In re U. S. Financial Securities Litigation*, 375 F.Supp. 1403 (Jud.Pan.Mult.Lit.1974).

On its own motion, the court below struck all demands for jury trial in these consolidated cases. Judge Turrentine reasoned that the legal and factual issues were of such complexity as to be beyond the practical abilities and limitations of a jury. *In re U. S. Financial Securities Litigation*, 75 F.R.D. 702 (S.D.Cal.1977). Recognizing the importance of the jury trial question, it was certified for interlocutory appeal under 28 U.S.C. § 1292(b). By an order filed on August 29, 1977, this court granted permission to appeal.

## II. *BACKGROUND*

In order to place this case and the question presented by it in perspective, its background is developed more fully than is normally necessary. Recently, there has been considerable controversy surrounding the Seventh Amendment's guarantee of civil jury trial and the abilities of jurors as factfinders in complex lawsuits.[3] We therefore briefly sketch the history of USF, the status of the present litigation, the analysis

---

* The Honorable William M. Byrne, United States District Judge for the Central District of California, sitting by designation.

1. There have been criminal proceedings, SEC proceedings, bankruptcy proceedings, and private civil damage actions. The present case involves the latter category. Some of the published decisions include: *Matter of U. S. Financial, Inc.*, 594 F.2d 1275 (9th Cir. 1979) (appeal from bankruptcy); *In re United States Financial Securities Litigation*, 75 F.R.D. 702 (S.D. Cal.1977) (order striking jury demand); *In re U. S. Financial Securities Litigation*, 74 F.R.D. 497 (S.D.Cal.1975) (order striking oppressive interrogatories); *In re U. S. Financial Securities Litigation*, 69 F.R.D. 24 (S.D.Cal.1975) (order certifying class); *In re U. S. Financial Securities Litigation*, 385 F.Supp. 586 (Jud.Pan.Mult. Lit.1974) (transfer order); *In re U. S. Financial*

*Securities Litigation*, 375 F.Supp. 1403 (Jud. Pan.Mult.Lit.1974) (transfer order); *In re Financial Securities Litigation*, 64 F.R.D. 443 (S.D.Cal.1974) (order certifying classes); and *In re U. S. Financial Litigation*, 64 F.R.D. 76 (S.D.Cal.1974) (SEC proceeding).

2. As explained elsewhere in this opinion (*see* n. 10 *infra*), several of the cases have apparently been settled and dismissed by the district court. However, none of the parties who have settled have sought dismissal from this court pursuant to Fed.R.App.P. 42(b). Although the present appeal is moot as to these parties, their names and their Ninth Circuit docket numbers remain in this decision's caption due to the noncompliance with Fed.R.App.P. 42(b).

3. *See e. g., Time* magazine, Sept. 3, 1979, p. 61.

used by the court below, and that used by the other federal district courts which have lately addressed the same issue.

### 1. *History of USF*

USF grew slowly for the first three years after it was incorporated in 1962 as West Coast Financial.[4] Initially, it was primarily engaged in small accounts receivable financing. In 1964 the USF name was adopted and the company expanded into real estate financing and title insurance. USF also made its first public stock offering and filed a registration statement with the SEC in 1964.

USF's growth and expansion began in earnest when R. H. Walter was appointed president in 1966. Walter brought his two real estate development companies and the joint venture concept with him to USF.[5] That same year, USF formed U.S. Mortgage as a subsidiary to make long-term loans on real estate projects.

In 1967, USF acquired Capital Leasing Company. It also formed another subsidiary, U. S. Realty, as a real estate sales and management company. And in 1968, USF sold 250,000 shares of common stock in an interstate offering at $10.75 per share.

During 1969 it continued to expand its operations in the real estate field. Twenty million dollars was raised from a public offering of 15,000 units, each consisting of ten shares of common stock and one 5½% convertible subordinated debenture with a face value of $1,000, due in 1989. USF organized and acquired additional title insurance companies, and expanded its real estate operations with the acquisition of San Carlos Construction Co. and Duc and Elliott Development Company. Additionally, U.S. Guaranty Capital was formed to make interim construction loans.

USF continued its capital expansion in 1970 with another securities offering through U. S. Financial Overseas, N.V., a wholly-owned Netherland Antilles subsidiary of USF.[6] The offering was for $12.5 million in 9% debentures, due 1982, guaranteed by USF, and which came with attached warrants for the purchase of ten shares of USF common stock. During 1970 USF acquired three more companies, Development Creators, Inc., an architectural firm, Mosser Construction, Inc., an Ohio corporation engaged in heavy construction, and Shelton Corporation, a Hawaiian real estate company. In keeping with its rapid

---

**4.** This skeletal outline of USF's history is taken from the "Plaintiffs' Pre-Trial Memorandum." Clerk's Record (C.R.) 6234–7065.

**5.** According to the "Plaintiffs' Pre-Trial Memorandum," the "joint venture concept" caused many of USF's subsequent problems. The plaintiffs' explain the operation of the typical USF joint venture as follows:

> USF sold real estate to a general contractor at a price set by USF and financed the purchase either by loaning the general contractor the money or by guaranteeing a loan to him. The price at which USF sold the property to a typical USF joint venture partner was determined by USF by adding USF's anticipated future profits from the joint venture to USF's cost basis in the real estate. USF recognized as earnings the difference between its cost basis in the real estate and the price at which it sold the real estate to its joint venture partner. After the sale, the joint venture partner contributed the property to the joint venture as his capital contribution to the venture, which assumed all of the debt on the property. USF charged the joint venture a variety of fees for services allegedly performed. All fees charged by USF to

joint ventures in which it participated were reported as earnings by USF prior to 1971. Since the only source of funds for the joint venture was USF, its fees were customarily paid by notes payable to USF or one of its subsidiaries or by cash which USF had contributed to the joint venture. The joint venture partner earned such overhead allowances as a general contractor as were set forth in the joint venture agreement. In form, joint venture development of a project was undertaken jointly by USF and a builder. In substance, the joint venture was controlled by USF which had the responsibility for and received the profits from the development of the project.

C.R. 6257–6258. This enabled USF to recognize earnings although it may not have received any cash, only the notes from the joint venture partner.

**6.** One of the purposes of the foreign offering was to avoid various registration requirements of the federal securities law. *In re U. S. Financial Securities Litigation*, 69 F.R.D. 24, 31 (S.D. Cal.1975).

growth, USF common stock was listed on the New York Stock Exchange in December of 1970.

USF's capital growth continued in 1971 with the offering of $35 million of 5½% convertible subordinated debentures in this country. Unfortunately for its investors, 1971 was the last year of USF's phenomenal growth. USF's reported assets had risen from $338,795 in 1962 to more than $310 million in 1971, its revenues from $8,876 to more than $180 million, and its earnings from $1,215 to over $6 million. The price of USF common stock had also increased correspondingly. From a selling price of less than $5.00 per share it soared to $92.00 per share in 1969, and following a three for two split in 1969 it had risen to a price of $57.00 per share in 1971.

USF was a vertically-integrated company at the time of its downfall. It was in the business of developing, constructing, operating, marketing, and financing real estate projects, individually and as a "participant" in joint ventures. The construction and financing of the real estate developments were controlled through its subsidiary corporations. These various operations were further supplemented by USF's wholly-owned title insurance and casualty insurance companies.

Despite some problems in 1971, the collapse did not begin until 1972 after the SEC had begun investigating the USF operations.[7] In late 1972 the SEC suspended trading in USF securities altogether. At this time USF had approximately 4.5 million outstanding shares of common stock. In 1973, USF began a Chapter XI arrangement proceeding in bankruptcy which has since been converted into a Chapter X reorganization proceeding.

### 2. Status of the Present Litigation

On June 24, 1977, when the district court entered its order striking the demands for jury trial, there were eighteen consolidated cases.[8] Subsequently, certain plaintiffs brought additional claims, increasing the total number of actions to twenty.[9] However, several of the cases have been settled and dismissed since the district court's order.[10] This court has been advised that there are ten cases remaining, four of

---

**7.** In 1971, USF's chief financial officer resigned after refusing to sign an SEC report because of his inability to determine the accuracy of the reported financial information. The SEC began inquiring into USF's accounting practices that same year after an article in a leading financial newspaper criticized the method by which USF accounted for its joint ventures. *See* n. 5, *supra.* A new outside accounting firm was hired and fired shortly thereafter when it was discovered that different auditing procedures would be used. After receiving USF's 1971 financial statements, in 1972 the SEC began its investigation in earnest into the USF operations.

**8.** *See* Appendix A following the district court's decision at 75 F.R.D. 715–719.

**9.** The two new actions were: *Colonial Growth Shares, Inc. v. Brown, Wood, Fuller, Caldwell & Ivey, et al.*, Civil No. 77–0454–T (S.D.Cal.), and *Mellon Bank, N. A., et al. v. Brown, Wood, Fuller, Caldwell & Ivey, et al.*, Civil No. 77–457–T (S.D.Cal.).

**10.** According to the "Joint Supplemental Brief of the Plaintiff-Appellants," the following cases have been settled and dismissed:
*One Common Stock Class Action* :

*Penn Mart Realty Company v. U. S. Financial Inc., et al.*, Civil No. 74–281–T (S.D. Cal.).
*Two Domestic Debenture Class Actions* :
*Michael Fabrikant, et al. v. Robert G. Stewart*, et al., Civil No. 74–282–T and 74–283–T (S.D.Cal.).
*Three Domestic Debenture Private Actions* :
*Decatur Income Fund, et al. v. Touche Ross & Co., et al.*, Civil Nos. 74–284–T, 74–285–T and 74–354–T (S.D.Cal.).
*One Domestic Debenture and Common Stock Private Action* :
*Mellon Bank, N. A., et al. v. Touche Ross & Co., et al.*, Civil No. 74–288–T (S.D.Cal.).
*One Domestic Debenture and Common Stock Private Action* :
*Mellon Bank, N. A., et al. v. Brown, Wood, Fuller, Caldwell & Ivey, et al.*, Civil No. 77–457–T (S.D.Cal.).
*One Common Stock Private Action* :
*Robert D. Kelce v. Touche Ross & Co. and Union Bank*, Civil No. 75–1119 (S.D.Cal.).
*One Injunction Proceeding* :
*Securities and Exchange Commission v. U. S. Financial, Inc., et al*, Civil No. 74–92 (S.D.Cal.).

which, while still pending, have never been, and are not now, being actively pursued.[11]

Thus, there are six remaining active cases. The appellants maintain[12] that these six actions actually amount to only three separate prosecutions. The three remaining cases brought by Societe Generale De Banque, they contend, allege a single continuing scheme to defraud, causing damages to a class of debenture purchasers, by Touche Ross & Co., Union Bank, and Brown, Wood. Liability is predicated upon violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, and also for common law fraud and negligence. The appellants contend that the two separate actions brought by Colonial Growth, and the one action by Bank of Toledo, are all based upon the same continuing scheme to defraud which forms the basis of the Societe Generale De Banque actions.

The appellees claim that the dismissals have done little, if anything, to reduce the complexity of the issues, the volume of the evidence, or the estimated length of trial. Furthermore, they contend that the nature and scope of the legal and factual issues remain basically the same as they were before any settlements were reached. The trier of fact will still have to decipher the financial statements and accounting procedures of USF for the period from 1966 through 1972. Since differing degrees of difficulty and complexity would not alter our ultimate decision, we accept the appellees' representations.

### 3. District Court Decision

In a carefully thought out opinion the district court presents a persuasive argument as to why there should be an exception to the Seventh Amendment right to jury trial in this type of case. The practical difficulties created by the size and scope of these consolidated cases are vividly illustrated.[13] Nevertheless, such practical considerations diminish in importance when they come in conflict with the constitutional right to a jury in civil cases.

The court, under the compulsion of the Seventh Amendment guarantee, acknowledged that the right to jury trial was dependent upon the legal or equitable classification of the case. After quoting several

---

**11.** The following cases are still pending, according to the "Joint Supplemental Brief of the Plaintiff-Appellants":

*Society Generale De Banque, Rentinvest, North American Fund A and ITF Fund Ltd. v. Touche Ross & Co.*, Civil No. 74–569–T (S.D.Cal.).
*Societe Generale De Banque, Rentinvest, North American Fund A and ITF Fund Ltd. v. Union Bank*, Civil No. 75–1044–T (S.D.Cal.).
*Society Generale De Banque, Rentinvest, North American Fund A and ITF Fund Ltd. v. Brown, Wood, Fuller, Caldwell & Ivey and Brown, Wood Ivey, Mitchell & Petty*, Civil No. 76–819–T (S.D.Cal.).
*Colonial Growth Shares, Inc. v. Touche Ross & Co., et al.*, Civil No. 74–436–T (S.D.Cal.).
*Colonial Growth Shares, Inc. v. Brown, Wood, Fuller, Caldwell & Ivey, et al.*, Civil No. 77–0454–T (S.D.Cal.).
*First National Bank of Toledo, etc., et al. v. U. S. Financial Incorporated, et al.*, Civil No. 74–286–T (S.D.Cal.).
*John Risque v. Robert Walter*, Civil No. 73–312 (S.D.Cal.).
*R. G. Stewart v. Touche Ross & Co., et al.*, Civil No. 74–452 (S.D.Cal.).
*William H. Huff v. Touche Ross & Co.*, Civil No. 75–1107 (S.D.Cal.).

*William Foote v. R. H. Walter, et al.*, Civil No. 73–508 (S.D.Cal.).

The last four cases listed are the ones which have apparently never been actively prosecuted. In the supplemental brief filed on behalf of the appellees, it is implied that the last two cases listed may have also been settled. Since these are two of the dormant cases, it is unnecessary to resolve the discrepancy between the briefs.

**12.** For purposes of clarity, we refer to the appellants (who include both plaintiffs and defendants in the various cases in the district court and who are by far in the numerical majority on appeal) as those opposing the order striking the demands for jury trial. The appellees are those who argue in favor of the district court's decision and order.

**13.** The court *estimated* that the fact-finder will need to read over 100,000 pages of paper which would be the equivalent of reading the first 90 volumes of the Federal Reporter, 2d Series. It was further estimated that the trial would take at least two years. Concern was also expressed as to where a courtroom could be found to seat all of the attorneys, let alone the parties to the case.

English and American court decisions with approval for their disparaging remarks about the abilities of juries,[14] the court then reasoned somewhat as follows: If this case falls within equity jurisdiction, then there is no right to jury trial. Equity has jurisdiction over cases in which there is no adequate remedy at law. The inability of juries to handle complex cases and render a fair decision means that there is no adequate remedy at law. Therefore, complex cases are within equity jurisdiction and there exists no right to jury trial in them.

Support for this reasoning is drawn from *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). In *Dairy Queen*, the court made the observation that a plaintiff may bring an action for an equitable accounting only when it can be shown ". . . that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them." 369 U.S. at 478, 82 S.Ct. at 900. And, in the *Ross* decision the court noted that one of the factors used in determining whether a case was legal or equitable was ". . . the practical abilities and limitations of juries." 396 U.S. at 538, n. 10, 90 S.Ct. at 738, n.10 (referred to as *Ross* footnote).

The decision then takes a quantum leap and establishes some general guidelines as to when the "complexity exception"[15] will deny to a litigant his constitutional right to a civil jury trial. These are:

"First, although mere complexity is not enough, complicated accounting problems are not generally amenable to jury resolution. Although such problems often arise only during the damages portion of a trial, they sometimes are present during the liability portion as well . . . only a case in which such a special master could not assist the jury meaningfully may be subject to removal from the province of the jury because of complex accounts.

"Second, the jury members must be capable of understanding and of dealing rationally with the issues of the case.

"And third, an unusually long trial may make extraordinary demands upon a jury which would make it difficult for the jurors to function effectively throughout the trial."

75 F.R.D. at 711. The court found the first two guidelines satisfied based on its conclusion that a jury was not capable of either understanding or rationally reconciling the mass of data, the variety of legal theories, and the number of parties involved in the case. Since the trial time was estimated at two years, the court concluded that it would be very difficult to find a jury which could sit for that long.

### 4. Other District Courts

Recently, five other district courts have also faced the question of whether jury trial should be denied in complex cases.[16] The focal point of the various inquiries has cen-

---

**14.** For instance: ". . . the Court was better able to judge then [sic] a jury of ploughmen. . . ." *Clench v. Tomley*, 21 Eng.Rep. 13 (1603); "[i]t is unfair to a litigant to have his case determined by a tribunal [a jury] which cannot fulfill that duty with accuracy or justice, however intelligent and desirous of doing their full duty the tribunal may be." *Bennet v. United Lumber and Supply Co.*, 110 Conn. 536, 538, 148 A. 369 (1930); "[i]t would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion . . . ." *Kirby v. Lake Shore & Michigan Southern Ry.*, 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569 (1887).

**15.** The court below did not refer to its rule as an exception to the Seventh Amendment since it did utilize the legal/equitable test for determining when the right would apply. We recognize that in *form* alone it may not be an exception, but the *reality* or *substance* of the rule does create an exception. And so we choose to refer to it in that manner.

**16.** Two other district courts have also discussed the issue in brief opinions. In *Jones v. Orenstein*, 73 F.R.D. 604 (S.D.N.Y.1977), the court refused to strike the jury demand in a securities fraud case. And, in *S.E.C. v. Associated Minerals, Inc.*, 75 F.R.D. 724 (E.D.Mich. 1977), the court struck the jury request relying primarily on the equitable nature of the injunctive relief sought by the S.E.C.

tered around the previously-mentioned footnote from the *Ross* decision and its consideration of the practical abilities and limitations of juries. Agreeing with the court below, thus far three of the other five courts have also found a "complexity exception" to the Seventh Amendment.

First in this line of decisions was the case of *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99 (W.D.Wash.1976). The district court struck the demands for a jury trial because of the complicated nature of the accounting and securities issues. The order was based upon the *Ross* footnote which the court found to be of "constitutional dimensions." And the court also relied in part upon the due process clause which it found required fairness in decision-making, something which a jury was incapable of doing in a case of *Boise Cascade's* complexity.

The plaintiff in *Radial Lip Mach., Inc., v. Intern. Carbide Corp.,* 76 F.R.D. 224 (N.D. Ill.1977), moved to strike the defendants' demand for jury trial. *Radial Lip* was a complicated trademark and patent infringement case with claims and counterclaims seeking a wide variety of legal and equitable relief. Faced with the argument based upon the *Ross* footnote, the court reasoned that this did not mean that the practical abilities and limitations of juries operated as an exception to the Seventh Amendment. The court also rejected the contention that the case was of such extraordinary complexity that only a court of equity could unravel the issues.

The court, in *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59 (S.D.N.Y.1978), on its own motion, struck the plaintiffs' demand for jury trial. Various composers and lyricists brought *Bernstein* as a class action, alleging various antitrust violations. The court based its decision on what were viewed as the court's traditional equity powers, which were found to include " . . . the power to strike a jury demand when to allow it to stand would work an injustice." 79 F.R.D. at 66. Relying principally on the *Ross* footnote, the court concluded that " . . . the sheer size of the litigation and the complexity of the relationships among the parties render it *as a whole* beyond the ability and competence of any jury to understand and decide with rationality." 79 F.R.D. at 70.

In another decision from a district court in this circuit, an order was entered striking a jury demand. *ILC Peripherals v. International Business Machines,* 458 F.Supp. 423 (N.D.Cal.1978).[17] *ILC Peripherals* was a complicated antitrust case where the court, after dismissing a hopelessly deadlocked jury, entered a directed verdict in favor of the defendant. As part of its decision, the court entered an order striking the jury demand in the event of a remand for a retrial. The court relied principally on the *Ross* footnote:

> "It is the third factor of the equation, the practical abilities and limitations of jurors, that causes the court to conclude that the issues in this case must be considered to be equitable."

458 F.Supp. at 445. Where the issues are beyond the abilities of a jury, the court reasoned, the legal remedy becomes inadequate and equity jurisdiction attaches. Unlike any of the other district court decisions on this issue, the *ILC Peripherals* court based its decision upon "its own observations during the five month trial." 458 F.Supp. at 447.

The most exhaustive analysis of the jury issue by any court was the recent opinion, *In re: Japanese Electronic Products Antitrust Litigation,* 478 F.Supp. 889 (E.D.Pa. 1979).[18] In the consolidated cases which were described as "so massive as to make

---

**17.** This case is currently pending on appeal before this court. Nothing that we say in this opinion should be taken as a comment on the merits of that case. However, later in this opinion we do address an argument which is based on a remark made by one of the jurors in that case. By an order entered August 23, we allowed International Business Machines Corporation to file an Amicus Curiae brief because of its interest in the jury trial question resulting from the *ILC Peripherals* case.

**18.** Judge Becker's scholarly decision is over one hundred pages in length, and is possibly

them unique in the annals of United States antitrust and trade regulation litigation," the district court refused to strike the plaintiffs' jury demands.[19]

## III. *DISCUSSION*

Analytically, we are faced with three different arguments as to why the Seventh Amendment right should not apply to this class of complex civil cases.[20] The first approach follows the historical legal-equitable test. Complex commercial litigation, such as the present case, is analogized to an "equitable accounting," where there was no right to jury trial. The second argument, based upon the *Ross* footnote, asks the court to adopt a new interpretation of the Seventh Amendment and examine the practical abilities and limitations of juries. The final argument claims that due process requires trial by the court when a jury cannot comprehend the issues and evidence in the case. After a short explanation of the historical background of the Seventh Amendment, we will address each of these arguments.

### 1. *Historical Background*

Throughout this country's history, the Seventh Amendment and the right it is designed to guarantee, has engendered neither the controversy nor the litigation that has surrounded some of the other nine Amendments forming the Bill of Rights. Nevertheless, the importance of the civil right to jury trial should not be underestimated.[21]

The right to jury trial arrived on the shores of this country with the first English

---

the only decision with its own table of contents.

**19.** The best summary of this decision was by the author himself in his conclusion where he said:

"This opinion has addressed a number of questions in order to determine whether the Seventh Amendment right to trial by jury applies even in a case so massive and so complex that serious questions of jury competence may be raised.

"Because the historical test for the Seventh Amendment defines the parameters of the constitutional right to a jury trial by reference to English practice in 1791, we have explored the traditional boundaries of the jurisdictions of courts of law and courts of equity. Our survey demonstrated that some cases normally belonging to the courts of common law could, if sufficiently complex, be brought in equity. But this was possible only in actions seeking an 'accounting,' and only at the plaintiff's option. Because this is not an 'accounting' case, and because here the plaintiffs actively seek a jury trial, the historical test requires that a jury be available. This conclusion is buttressed by other considerations as well. There is little evidence that the plaintiff's historical ability to bring complex accounting matters to a court of equity was attributable to considerations of jury competence and, in any event, it may not have survived the merger of law and equity. Moreover, the remedy of treble damages sought in the case before us is one which was traditionally available *only* on the verdict of a jury in a court of common law.

"We next examined the Supreme Court's recent decisions in order to determine whether questions of jury competence had been elevated to constitutional stature by the mention in *Ross v. Bernhard* of 'the practical abilities and limitations of juries.' We determined that to so read the *Ross* dictum would be inconsistent with the intentions of the Supreme Court, with settled principles of jurisprudence, and with the very policies expressed in the Seventh Amendment itself. We have concluded, therefore, that the complexity of the case before us is not a constitutionally permissible reason for striking the plaintiffs' jury demands."
At 942.

**20.** We recognize the principle that this court must first ascertain whether it is possible to construe whatever statute is involved in a case so as to avoid the constitutional question. *Curtis v. Loether,* 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). The parties do not even consider this in their briefs, nor does this court need to be detained long by it. The present case is primarily based upon the federal securities law which does not contain any indication whether jury trial should be allowed in private civil damage actions under its provisions. *See generally* 15 U.S.C. § 77a, *et seq.* In the absence of any wholly statutory grounds, we must therefore look to the constitutional question under the Seventh Amendment.

**21.** For an excellent discussion of the historical background of the Seventh Amendment, see Wolfram, *The Constitutional History of the Seventh Amendment,* 57 Minn.L.Rev. 639 (1973) (hereinafter referred to as Wolfram).

colonists.[22] The original Jamestown charter guaranteed all the rights of Englishmen to the colonizers, including trial by jury.[23] During the next two hundred years of development in colonial America, the right to jury trial continued to expand.[24] The principles embodied in jury trials found a receptive atmosphere in the egalitarian principles of the colonists. By 1776, the right to jury trial existed, in one form or another, in each one of the thirteen colonies.[25] In fact, one of the primary grievances against England at the time of the Declaration of Independence was the restriction on the right to jury trial.[26] Colonial administrators had been circumventing the right by trying various cases, both criminal and civil, in the vice-admiralty courts.[27]

When the Constitution was finally drafted, there was limited debate as to whether the civil right to jury trial should be included.[28] The lack of this guarantee formed one of the primary arguments against the adoption of the new Constitution.[29] The right to jury trial in civil cases, embodied in the Seventh Amendment, then became one of the chief reasons supporting the adoption of the Bill of Rights.

This does not mean that juries were not without their detractors. The Federalists generally opposed juries and the Seventh Amendment. Since their arguments did not carry the day, we do not believe that we should give much credence to the Federalists' opinions about the abilities of juries as suggested on appeal.[30]

The preceding brief historical sketch serves to illustrate the significance of the civil right to a jury. Additionally, certain general considerations pertaining to the nature and construction of the Seventh Amendment further dramatize the importance attached to it.

---

22. Simon, *Introduction* to The Jury System in America at 15 (1975).

23. Hyman and Torrant, *Aspects of American Trial Jury History,* in The Jury System in America at 24–25 (1975).

24. *Id.*

25. Wolfram, *supra* n. 21, at 655.

26. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 340, 99 S.Ct. 645, 58 L.Ed.2d 552 (Rehnquist, J., dissenting), and sources cited therein.

27. Wolfram, *supra* n. 21, at 654 n. 47.

28. Wolfman, *supra* n. 21, at 657–661.

29. During the debates on its adoption, Alexander Hamilton noted that "[t]he objection to the [Constitution], which has met with the most success . . . is *that* relative to *the want of a constitutional provision* for the trial by jury in civil cases." *The Federalist* No. 83, p. 558 (J. Cooke ed. 1961). And, as Justice Story observed in 1830:

"One of the strongest objections originally taken against the Constitution of the United States was the want of an express provision securing the right of trial by jury in civil cases. As soon as the Constitution was adopted, this right was secured by the seventh amendment of the Constitution proposed by Congress; and which received an assent of the people so general as to establish its importance as a fundamental guarantee of the rights and liberties of the people."

*Parsons v. Bedford,* 3 Pet. 433, 28 U.S. 433, 446, 7 L.Ed. 732 (1830).

30. For instance, the following passage is cited from Hamilton's discussion as to why it was unnecessary for the Constitution to guarantee a right to jury trial in civil cases:

"[T]he circumstances that constitute cases proper for courts of equity are in many instances so nice and intricate that they are incompatible with the genius of trials by jury. They require often such long, deliberate, and critical investigation as would be impracticable to men called from their occupations, and obliged to decide before they were permitted to return to them. The simplicity and expedition which form the distinguishing characters of this mode of trial require that the matter to be decided should be reduced to some single and obvious point; while the litigations usual in chancery frequently comprehend a long train of minute and independent particulars.

" . . . [T]he attempt to extend the jurisdiction of the courts of law to matters of equity will not only be unproductive of the advantages which may be derived from the courts of chancery, on the plan upon which they are established in this State, but will tend gradually to change the nature of the courts of law and to undermine the trial by jury, by introducing questions too complicated for a decision in that mode."

*The Federalist* No. 83, pp. 569–70 (J. Cooke ed. 1961).

In *Jacob v. City of New York,* 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942), the Supreme Court noted that:

> "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."

315 U.S. at 752–753, 62 S.Ct. at 854. The Court has also explained that:

> "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to jury trial should be scrutinized with the utmost care."

*Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed.2d 603 (1935), *quoted with approval in Beacon Theatres v. Westover,* 359 U.S. 500, 501, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). With these general considerations in mind, we turn to the question of whether the Seventh Amendment protects the right to jury trial in the present case.[31]

### 2. *Historical Approach*

Whenever a court is called upon to interpret the Constitution, its analysis must begin with the language of the constitutional provision which it is called upon to interpret. Initially, we must therefore look to the Seventh Amendment which provides as follows:

> "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law."

The surface simplicity of this provision is beguiling for the exact scope of its application was unclear even when it was first adopted.

The Seventh Amendment "preserved" the right to jury trial in all suits "at common law." The basic purpose behind it was to maintain the right to jury trial as it existed when the Amendment as adopted in 1791. Because the Amendment speaks in terms of preservation, an historical test has been employed to determine its application. And since it refers to the common law, reference is made to the English practice as the source of this country's common law.[32]

The classic explanation of what was meant by "common law" was made by Justice Story almost one hundred fifty years ago:

> "The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence. . . . By common law they meant what the Constitution denominated in the third article 'law;' not merely suits, which the common law recognized among its old and settled proceedings, but suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable

**31.** It should also be noted that Fed.R.Civ.P. 38(a) provides that:

> "The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate."

**32.** It is an interesting question as to why reference is made to English practice, rather than the practice as it existed in the United States. The first statement of this rule was by Justice Story on Circuit in 1812, when he said:

> "Beyond all question, the common law here alluded to is not the common law of any individual state (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence. It

cannot be necessary for me to expound the grounds of this opinion, because they must be obvious to every person acquainted with the history of the law."

*United States v. Wonson,* 28 F.Cas. 745, 750 (C.C.D.Mass.1812). The best explanation comes from one commentator who made the following observation:

> "No federal case decided after *Wonson* seems to have challenged this sweeping proclamation; perhaps later judges have hesitated to appear to be the kind of intractable person that would require Mr. Justice Story to elaborate on the obvious."

Wolfram, *supra* n. 21, at 641.

rights alone were recognized, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity was often found in the same suit. . . In a just sense, the amendment, then, may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights."

*Parsons v. Bedford,* 3 Pet. 433, 28 U.S. 433, 446–447, 7 L.Ed. 732 (1830).

■ The right to jury trial does not depend on the character of the overall action but instead is determined by the nature of the issue to be tried. *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Thus, there is a right to jury trial when the issue presented in a case would have been heard at common law. And conversely, there is no right when the issue presented in a case, viewed historically, would have been tried in the courts of equity, or in some other manner without a jury.[33]

■ Thus, the basic consideration in determining when the right to jury trial applies depends on the ancient distinction between law and equity. Since the merger of law and equity in 1938, some have stated that this is the only area where the distinction has any further significance. *Groome v. Steward,* 79 U.S.App.D.C. 50, 142 F.2d 756 (D.C.Cir.1944).

Although the primary test depends upon the distinction between law and equity, courts are not rigidly bound to the procedural rules and forms of action as they existed in 1791. Several procedural devices developed and expanded since 1791 have infringed upon the civil jury's historic role; nevertheless, they have been found consistent with the Seventh Amendment.[34] Conversely, other procedural developments have limited the scope of equity jurisdiction, and expanded the right to jury trial.[35] Additionally, it is too obvious to be doubted that the constitutional right to jury trial attaches to statutory causes of action as long as they involve legal rights and remedies.[36] Thus, the historical test is not static,

33. 9 Wright and Miller, Federal Practice and Procedure 14–15 (1971).

34. In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court held that expanded use of collateral estoppel did not violate the Seventh Amendment. Other cases relied upon were:

    *Galloway v. United States,* 319 U.S. 372, 388–393 [63 S.Ct. 1077, 1086–88, 87 L.Ed. 1458] (a directed verdict does not violate the Seventh Amendment); *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 497–498, [51 S.Ct. 513–14, 75 L.Ed. 1188] (retrial limited to question of damages does not violate the Seventh Amendment even though there was no practice at common law for setting aside a verdict in part); *Fidelity & Deposit Co. v. United States,* 187 U.S. 315, 319–321, [23 S.Ct. 120, 121–22, 47 L.Ed. 194] (summary judgment does not violate the Seventh Amendment).

439 U.S. at 336, 99 S.Ct. at 654.

35. *See Ross v. Bernhard,* 396 U.S. 531, 540–542, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (stockholder derivative suit); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (equitable accounting); *Beacon Theatres v. Westover,* 359 U.S. 500, 508–511, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (clean up doctrine).

36. *Curtis v. Loether,* 415 U.S. 189, 193, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). We believe that the reasoning Justice Marshall used in holding that there was a right to jury trial in private actions under Title VIII of the Civil Rights Act of 1968 is equally applicable to the present actions brought under the federal securities law:

    "We think it is clear that a damage action under § 812 is an action to enforce 'legal rights' within the meaning of our Seventh Amendment decisions. See, *e. g., Ross v. Bernhard, supra,* [396 U.S.] at 533, 542, [90 S.Ct. 733, 735, 740;], *Dairy Queen, Inc. v. Wood, supra,* [369 U.S.] at 476-477 [, 82 S.Ct. 894, 899]. A damage action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach. As the Court of Appeals noted, this cause of action is analogous to a number of tort actions recognized at common law. More important, the relief sought here—actual and punitive damages—is the traditional form of relief offered in the courts of law." (footnotes omitted)

415 U.S. at 195–196, 94 S.Ct. at 1009.

rather it is more in the nature of an historical inquiry, an inquiry which is guided by the statutory expansion of legal rights, and the procedural developments which have both expanded and retracted the role of the civil jury.

Returning to the present case, the appellees do not seriously contest the fact that the issues presented here are basically of a legal nature.[37] The remedy which is sought in all of the consolidated cases is damages, which is the traditional form of relief granted by the common law courts. The substantive rights asserted are, in part, based on the common law principle of fraud and negligence. The statutory rights under the securities laws (principally Section 10(b) of the Securities Exchange Act of 1934 and the rules and regulations which form its progeny) merely create new legal duties. An action seeking damages from a breach of any of these statutory duties is analogous to a tort action at common law. From this it is clear that the present cases, where legal relief is sought and legal rights are asserted, involve suits either at common law or analogous to common law actions where the Seventh Amendment preserves the right to jury trial.[38]

Nevertheless, the appellees claim that due to the complexity of the present case, it is analogous to an action for an equitable accounting where historically there has been no right to a jury.

This argument misses the mark. It attempts to have the legal or equitable nature of the case characterized as a whole rather than by examining the nature of the issues involved. As previously pointed out, the issues presented here are of a legal nature. The fact that resolution of the issues will involve an examination of USF's accounts, and accounting procedures, cannot transform the case into an action for an equitable accounting.[39]

The Supreme Court rejected a similar argument in *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). The plaintiff there had brought an action for an injunction restraining an alleged patent infringement and for an accounting for profits lost through the infringement. The Court decided that the plaintiff's characterization of the case as an action for an equitable accounting was of no consequence. The true basis of the action, the Court found, was on a "debt allegedly due under a contract . . . [or] for damages . . . ." 369 U.S. at 477, 82 S.Ct. at 899. The opinion went on to note that in view of the ability of masters to assist the jury in complicated cases, it would be extremely difficult to satisfy one of the prerequisites for bringing an equitable accounting; that is, a showing that the accounts between the parties are of such a

---

**37.** In one of the briefs from the appellees, we are asked to characterize fraud as historically involving neither solely a legal issue nor solely an equitable issue, and to characterize damages as not really a legal remedy in this case. The sophistic reasoning required to reach these characterizations does not withstand analysis under any prior Seventh Amendment experience.

**38.** The circuit courts which have considered the applicability of the Seventh Amendment right to jury trial in private civil actions for damages under the securities laws have proceeded as if such a conclusion were obvious. *See Aid Auto Stores, Inc. v. Cannon,* 525 F.2d 468, 469 n. 1 (2d Cir. 1975); *Johns Hopkins University v. Hutton,* 488 F.2d 912, 916 (4th Cir. 1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118; *Hohmann v. Packard*

*Instrument Co., Inc.,* 471 F.2d 815, 819 (7th Cir. 1973); *Dasho v. Susquehanna Corp.,* 461 F.2d 11, 24, 31 (7th Cir. 1972), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336; *Myzel v. Fields,* 386 F.2d 718, 740–41 (8th Cir. 1967), *cert.* denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143; *cf. Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 690 (9th Cir. 1977), *cert. denied,* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88.

**39.** In fact, the court below, relying upon *United States v. Bitter Root Development Co.,* 200 U.S. 451, 26 S.Ct. 318, 50 L.Ed. 550 (1906), and *Curriden v. Middleton,* 232 U.S. 633, 34 S.Ct. 458, 58 L.Ed. 765 (1914), correctly concluded that mere complication of facts was not sufficient to confer equity jurisdiction based on an equitable accounting theory. 75 F.R.D. at 709.

complicated nature that only a court of equity could unravel them.[40]

■ A suit for an "accounting" was a narrow and little-used ground for establishing equitable jurisdiction.[41] The present actions do not involve any claims for an equitable accounting. The questions in this case are of a legal character traditionally heard at common law. The fact that a case may involve accounting principles cannot magically convert the legal causes of action into an action for an equitable accounting.

### 3. The Ross Test

■ As we discussed earlier in this opinion, the Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970), decision has been interpreted by some courts and commentators as establishing a new test for determining the right to jury trial.[42] The court below held, and the appellees argue, that Ross establishes a test under which a court must inquire into the practical abilities and limitations of juries in resolving the Seventh Amendment question. We do not believe that Ross may be read as establishing a new test for determining when the Seventh Amendment applies.

In Ross, the plaintiffs had brought a stockholders' derivative suit against the directors of an investment company and the company's brokers. The complaint alleged statutory violations of the Investment Company Act of 1940, breach of fiduciary duties, and requested that the defendants return their profits to the company. Despite the fact that stockholders' derivative suits were historically only recognized in equity, the Court held that " . . . the right to jury trial attaches to those issues in derivative actions as to which the corporation, if it had been suing in its own right, would have been entitled to a jury." 396 U.S. at 532–533, 90 S.Ct. at 735. The Court viewed the prior rule which only allowed derivative suits to be brought in equity as merely a procedural obstacle which was "destroyed" by the merger of law and equity under the Federal Rules of Civil Procedure.

For our purposes here, the most important part of the Ross decision came during the discussion of Beacon Theatres v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), where the court said this:

> rare case in which it can be met. But be that as it may, this is certainly not such a case. A jury, under proper instructions from the court, could readily determine the recovery, if any, to be had here, whether the theory finally settled upon is that of breach of contract, that of trademark infringement, or any combination of the two. *The legal remedy cannot be characterized as inadequate merely because the measure of damages may necessitate a look into petitioner's business records.*" (footnotes omitted and emphasis added)
>
> 369 U.S. at 477–479, 82 S.Ct. at 899–900.

**40.** The entire passage where Mr. Justice Black discussed the equitable accounting argument is instructive and so it is quoted at length:

> "The respondents' contention that this money claim is 'purely equitable' is based primarily upon the fact that their complaint is cast in terms of an 'accounting,' rather than in terms of an action for 'debt' or 'damages.' But the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings. The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in Beacon Theatres, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them. In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicated for the jury adequately to handle alone, the burden of such a showing is considerably increased and it will indeed be a

**41.** See Note, 20 B.C.L.Rev. 511, 528–529 (1979).

**42.** See In re Boise Cascade Securities Litigation, 420 F.Supp. 99 (W.D.Wash.1976); Bernstein v. Universal Pictures, Inc., 79 F.R.D. 59 (S.D.N.Y.1978); ILC Peripherals v. International Business Machines, 458 F.Supp. 423 (N.D.Cal.1978); Kane, Civil Jury Trial: The Case for Reasoned Iconoclasm, 28 Hast.L.J. 1 (1976); Note, 83 Yale L.J. 401 (1973); Note, 10 Conn.L.Rev. 775 (1978); Note, 92 Harv.L.Rev. 898 (1979).

"The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action.[10]"

396 U.S. at 538, 90 S.Ct. at 738

This statement was explained in footnote 10 as follows:

"As our cases indicate, the 'legal' nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries. Of these factors, the first, requiring extensive and possibly obtruse historical inquiry, is obviously the most difficult to apply. See James, Right to a Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963)."

Based on this footnote, this court is asked to employ an inquiry into the practical abilities and limitations of a jury as the test for determining the application of the Seventh Amendment. We decline this invitation for several reasons.[43]

While it is unclear as to what was meant by the inclusion of the third factor, we do not believe that it stated a rule of constitutional dimensions. After employing an historical test for almost two hundred years, it is doubtful that the Supreme Court would attempt to make such a radical departure from its prior interpretation of a constitutional provision in a footnote.[44]

Another consideration involves the two sources cited for the rule: the vague reference to "our cases" and the *James* article. No Supreme Court decision prior to *Ross* ever utilized a test even partially dependent upon an inquiry into the abilities of jurors. The only occasions even remotely resembling such an inquiry are the equitable accounting cases, the significance of which *Dairy Queen* limited practically to the point of extinction.[45] The *James* article also fails to add any support to the use of the third factor, and, if anything, it counsels against such an inquiry. James explains that under the Constitution, judges are not free to examine what issues may be best suited for resolution by a judge or by a jury.[46]

While the Supreme Court has never specifically repudiated the third factor in the *Ross* footnote, it has never met with general acceptance by the courts.[47] In the *Ross*

---

**43.** Initially, we observe that footnote 10 of *Ross* was dictum totally unnecessary to the Court's holding. As such, it is not binding on this court.

**44.** *See* Wright, Law of Federal Courts 454 (3d ed. 1976).

**45.** *See* n. 40, *supra.*

**46.** The entire discussion on this follows:

"(a) *An eclectic test.* No one has explicitly suggested re-examination of the whole matter with a view to determining what issues or types of issues are best fitted for court trial or jury trial. If all were *tabula rasa,* and some solon were trying to devise an ideal system for the administration of justice, he would probably approach the jury trial problems with just such an inquiry in mind. And it my well guide the future course of those charged with amending or recasting constitutions or, within narrower compass, of legislators. But as a guide for *judicial,* as opposed to political, action in the matter any such test meets serious difficulties. *For one thing the constitutions themselves, as we have seen, impose a different test (namely an historical test which was never guided, even in the making, by the consideration here suggested as ideal).* Furthermore, even if the matter is

left to the people acting through their legislators, they lack any scientific way of telling what issues are best suited for jury or for court trial, and there is no general agreement (among judges, among politicians, within the profession, or in the community at large) about the matter or even about the underlying premises that should be assumed in making the evaluation. These difficulties seem to this writer quite insurmountable and indeed they should, it is submitted, inhibit judges from feeling free to take the bit in their teeth. Nevertheless it is natural and inevitable that a court's own value judgments will influence its decisions in close and doubtful cases." (footnotes omitted and emphasis added) James, *Right to Jury Trial in Civil Actions,* 72 Yale L.J. 655, 690–691 (1963).

**47.** Writing prior to the district court decisions which have used the *Ross* footnote to strike jury demands (see discussion of the *Boise Cascade, Bernstein,* and *ILC Peripherals* cases at Part II, section 4 of this opinion), Professor Wright explained that although some lower courts had paid lip service to the third factor:

"[c]ertainly there is no indication in the cases that the courts are adopting a balancing test, and weighing the practical abilities and limitations of jurors, to displace the traditional tests for when an issue is triable to a jury."

decision itself, the Court did not consider the practical abilities and limitations of juries. And, although the Supreme Court has considered the Seventh Amendment question in depth on at least five occasions since *Ross*, the abilities of juries have never been considered.[48] The subsequent decisions have all relied upon the traditional historical test.

Another factor which militates against our adoption of a new interpretation of the Seventh Amendment is our belief that it would be totally at odds with prior Seventh Amendment experience.[49] To consider the

practical abilities and limitations of juries within the context of complex cases would necessitate an examination of the whole case. However, the Seventh Amendment right has never been made dependent upon such an examination; it has always been the nature of the issue.[50] When a case involves mainly equitable issues and only incidental legal issues, the right to jury trial still attaches to the legal issues.[51] Under Seventh Amendment jurisprudence, an historical approach must still be followed.[52] Thus, we conclude that *Ross* may not be read as establishing a functional interpretation of the Seventh Amendment.[53]

Wright, Law of Federal Courts 454 (3d ed. 1976). And last spring one writer noted that: " . . . the majority of courts that have applied the *Ross* test have either ignored the third element [the practical abilities and limitations of juries] or determined that the claims presented were not beyond the analytical ability of a jury."
Note, 20 B.C.L.Rev. 511, 518 (1979).

**48.** *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Atlas Roofing Co. v. Occup. Safety Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Pernell v. Southall Realty*, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974); *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973).

In fact, the Seventh Circuit's decision expressly considered the "practical abilities and limitations of juries" in *Loether*. *Rogers v. Loether*, 467 F.2d 1110, 1118 (7th Cir. 1972), *aff'd sub nom., Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and yet the Supreme Court did not even mention this factor in its decision.

**49.** One commentator noted that the *Ross* footnote:
" . . . is so cursory, conclusory and devoid of cited authority or reasoned analysis that it is difficult to believe it could have been intended to reject such established historical practice or Supreme Court precedent."
Redish, *Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making*, 70 Nw.U.L.Rev. 486, 526 (1975). And another commentator has explained it in this way:
"Standing as it does, thus alone, this fleeting expression in *Ross v. Bernhard* of infidelity to the centrality of the traditional historical test in seventh amendment determinations would hardly justify an announcement that the historical test has been superseded in the Federal courts."

Wolfram, *supra* n. 21, at 645.

**50.** *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

**51.** *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

**52.** Writing for the Second Circuit, Judge Friendly also refused to read *Ross* as establishing a new test under the Seventh Amendment:
" . . . the footnote in *Ross v. Bernhard* was part of an argument for applying the Seventh Amendment right to a jury trial where it had not been recognized before the merger of law and equity—not a suggestion that a type of statute which had uniformly been held to carry the right of jury trial should now be construed to eliminate it." *United States v. J. B. Williams Company, Inc.*, 498 F.2d 414, 428 (2d Cir. 1974).

**53.** The Supreme Court has used a functional approach in determining the right to jury trial in criminal cases; however, that right is secured by the Sixth rather than the Seventh Amendment. In interpreting the Sixth Amendment, the Court has rejected a historical test, concluding that "there [is] no indication that the Framers intended to preserve in the Constitution the features of the jury system at common law." *Burch v. Louisiana*, 441 U.S. 130, 135, 99 S.Ct. 1623, 1626, 60 L.Ed.2d 96 (1979). Instead, the Court has chosen to examine "the function that the particular feature performs and its relation to the purposes of the jury trial." *Williams v. Florida*, 399 U.S. 78, 99–100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970). In essence, the appellees argue that this type of functional approach, based on the *Ross* footnote, should be taken under the Seventh Amendment. However, in the absence of any direction from the Court that treatment of the right secured by the Seventh should parallel that secured by the Sixth, we reject any suggestion that we draw such an analogy here.

#### 4. *Due Process*

The appellees argue that their rights to due process under the Fifth Amendment would be violated if this case were tried to a jury. Because of the size and magnitude of the present litigation, they reason that a jury could not reach a rational decision. According to one of the briefs, due process dictates that a jury should not be required when the facts and issues are beyond a jury's comprehension.[54]

We assume, without deciding, that there is such a right to a "competent" fact-finder. However, we do not agree with the two assumptions upon which this argument is based, that is, the complexity and the inability of a jury to serve as fact-finder.

It should be noted that both of the arguments, discussed previously under the historical approach and the *Ross* test, shared the same underlying premise. With the historical approach, had we found this case analogous to an equitable accounting, then an inquiry into the ability of a jury in complex cases would have been necessary; just as it would were we to follow the suggested *Ross* test. Because of the manner by which we approached those arguments it was unnecessary to examine the abilities of juries in complex cases since we did not reach that step in their arguments. Had we found it necessary at that point to resolve the jury competence issue under either one of those arguments, we would have done so in the same manner as we do in the following discussion; that is, a jury *is* a competent fact-finder in complex cases.

#### A. Complexity

Many cases appear overwhelmingly complicated in their early stages. Nevertheless, by the time such cases go to trial, what had initially appeared as an impossible array of facts and issues has been synthesized into a coherent theory by the efforts of counsel. Moreover, in answering the Seventh Amendment question, courts should take into consideration the various procedural developments which serve to simplify and facilitate the trial of a "complex" case to a jury.[55]

The assumption that attorneys cannot develop and present complex cases to a jury underestimates the abilities of the bar, especially the experienced and capable counsel associated with the present litigation. Whether a case is tried to a jury or to a judge, the task of the attorney remains the same. The attorney must organize and assemble a complex mass of information into a form which is understandable to the uninitiated. In fact, one judge has suggested attorneys may do a better job of trying complex cases to a jury than to a judge.[56]

Also, the trial judge has the power and the authority to control, manage and direct the course of complex cases. The Federal Judicial Center developed the *Manual for Complex Litigation* for just such cases.[57]

54. There is also a suggestion of a due process problem because business people and professionals would be unable to take the time to serve as jurors because of the length of complex antitrust and securities trials. This, so the theory goes, deprives the parties of a fair cross section of the community. However, parties are only entitled to a jury which is *drawn* from a fair cross section, not a jury which is a mirror image of the community. *See* 28 U.S.C. § 1861; *United States v. Ross,* 468 F.2d 1213, 1217 (9th Cir. 1972), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188.

55. *See Ross v. Bernhard,* 396 U.S. 531, 540–542, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres v. Westover,* 359 U.S. 500, 508–511, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

56. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power,* 56 Tex.L.Rev. 47, 54–55 (1977) (hereinafter referred to as Higginbotham). Judge Higginbotham is a United States District Judge for the Northern District of Texas.

57. It is worthy of noting how the jury trial question was treated in the *Manual.* Although it was prepared with cases as complex as the present in mind, there is no suggestion, or anything from which even the most tenuous inference may be drawn, that the trial judge may consider striking a demand for jury trial. When the *Beacon Theatres* and *Ross* decisions are mentioned, it is in the following context:

"Caution: Make sure that the requirements for jury trial enunciated in *Beacon Theatres, Inc. v. Westover,* or *Ross v. Bernhard,* are

The *Manual* is designed to provide for the fair, firm, and efficient judicial control of complex litigation. *Id.* p. IV. A district judge is not left in the position of a captain whose ship, lacking a rudder and throttle, proceeds at its own speed in its own direction. Instead, the *Manual* encourages and provides suggestions as to how the district judge should exercise control over the parties and give the case direction.

Various occurrences prior to trial may assist in simplifying the overwhelmingly complex case. *Tights, Inc. v. Stanley*, 441 F.2d 336, 339–340 (4th Cir. 1971), *cert. denied*, 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 91. A motion under Fed.R.Civ.P. 12 may be used to test the sufficiency of an adversary's pleadings. The facts may become sufficiently clear on some issues to entitle a party to have judgment entered as a matter of law under Fed.R.Civ.P. 56. The parties may stipulate to the admissibility of evidence, or to the facts themselves, thus reducing the time necessary to present a case at trial. The trial court could also order separate trials on some of the claims or issues under Fed.R.Civ.P. 42(b).[58] And, as

it is apparent from the present case, many cases or issues may be settled prior to trial.[59]

When a case involves complicated issues, the trial judge may appoint a master under Fed.R.Civ.P. 53(b) to assist the jury.[60] In referring matters, the court has considerable discretion in deciding what the master should undertake to report upon. Fed.R. Civ.P. 53(c). We recognize that use of masters in jury cases is " . . . the exception and not the rule . . . ," because they do represent a limited inroad on the jury's traditional sphere. Fed.R.Civ.P. 53(b). Nevertheless, the use of a master is constitutional, and certainly is preferable to a denial of the Seventh Amendment right altogether.[61]

The Federal Rules of Evidence also provide for the simplification of the evidence presented at trial by allowing for the use of summaries of voluminous materials. Fed.R. Evid. 1006.[62] Since this rule should be construed so as to promote fairness, and eliminate unjustifiable expense and delay, it should be liberally employed in complex cases. *See* Fed.R.Evid. 102.[63] Whether the

---

not violated in ordering trial of a separate issue." (footnotes omitted)

*Manual, supra* at 139–140. In fact, when the *Manual* is read as a whole, it becomes apparent that its pervasive theme is how complex cases should be tried to a jury rather than why they should not.

**58.** The argument is raised by some of the briefs that, assuming a complexity exception to the Seventh Amendment, a court should not, by its own actions, be allowed to create the very condition, i. e., complexity, which makes jury trial impossible. In the present case, they claim that it was the order of consolidation, not the issues, which created the complexity. We doubt whether the discretionary command of Fed.R.Civ.P. 42(a) (allowing consolidation) can be read as limiting the mandatory command of Fed.R.Civ.P. 38 (preserving the right to jury trial). *See* 28 U.S.C. § 2072 also. Consolidation cannot alter the rights of the parties. *Johnson v. Manhatten Ry. Co.*, 289 U.S. 479, 496–497, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). As we are now ruling that the Seventh Amendment requires a jury trial in even the most complex cases at law, this argument is no longer relevant to the decision of this case.

**59.** *See* n. 10, *supra*.

**60.** The court below concluded that a special master would not be feasible for assisting the jury, but would be of assistance if the case were tried to the court. *Compare* 75 F.R.D. at 713 *with* 715. We fail to see why a master could not render meaningful assistance to a jury.

**61.** *See In re Peterson*, 253 U.S. 300, 309–311, 40 S.Ct. 543, 64 L.Ed. 919 (1920); *Crateo, Inc. v. Intermark, Inc.*, 536 F.2d 862, 868 (9th Cir. 1976), *cert. denied*, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180.

**62.** Rule 1006 provides as follows:

"The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

**63.** Rule 102 provides as follows:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion

present case is tried to a judge or a jury, in view of the estimates of the amount of documentary evidence the fact-finder will have to read,[64] there will need to be extensive reliance upon summaries.[65]

We generally accept the district court's characterization of the complicated nature of this case. It found that the fact-finder will, in part, need to focus on the following matters:

"a) Complex real estate transactions. There were many intricate purchases and sales of large parcels of real estate. Large construction projects were undertaken. The financing of the purchases and of the construction projects often involved a series of loans among various USF subsidiaries. Sometimes there would be a series of purchases and sales with each subsidiary involved in the deal reporting a profit on its share of the transaction.

"b) Reporting of income. Income reported was not always represented by cash in the bank. Income and profits from a variety of sources and in a variety of forms were reported. Sometimes the income was to be realized at a future date.

"c) Securities. USF bought and sold securities of some of its subsidiaries. The value of those securities, and the net worth of those subsidiaries, hence would be of importance. These figures, in turn, would be affected by some of the other matters listed above."

75 F.R.D. at 712. We recognize that a difficult task lies ahead for the fact-finder in attempting to understand and unravel the USF financial records. Nevertheless, we believe that the use of the aforementioned considerations should reduce what might otherwise be considered the overwhelming complexity of the present case.

### B. Abilities of Juries

The jury system has never been without its critics, which have included some of this country's most eminent judges.[66] The oppo-

---

of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

**64.** The district judge assumed that there would be 100,000 pages of documentary evidence presented. 75 F.R.D. at 707.

**65.** In the context of a criminal trial, Justice Frankfurter held for the Court that the use of summaries did not impair the jury's function, noting that "[n]o issue was withdrawn from the jury." *United States v. Johnson*, 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546 (1943).

**66.** The late Judge Jerome Frank of the Second Circuit was the most outspoken critic of the jury system in this century. In his book, *Courts on Trial*, he noted that he was not the only skeptic:

"My attitude towards the jury is not unique. James Bradley Thayer, a great legal scholar and a profound student of jury trials, said in 1898 that, in civil cases, 'I would restrict [jury trial] narrowly, for it appears to me . . . to be a potent cause of demoralization to the bar.' Learned Hand remarked in 1921, 'I am by no means enamored of jury trials, at least in civil cases. . . .' Mr. Justice Cardozo, in a Supreme Court opinion wrote, 'Few would be so narrow or provincial as to maintain that a fair and enlightened system of justice would be impossi-

ble without' jury trials. The noted historian, Carl Becker, one of the ablest students of American history and institutions, said in 1945: 'Trial by jury, as a method of determining facts, is antiquated . . . and inherently absurd—so much so that no lawyer, judge, scholar, prescription-clerk, cook, or mechanic in a garage would ever think for a moment of employing that method for determining the facts in any situation that concerned him.' Two very able and experienced trial judges, Judge Galston and Judge Shientag, have each recently indicated a belief that the use of the jury in civil suits should be severely restricted. Judge Shientag said: 'The civil jury would seem to be unnecessary except in a few types of injury to the person, such as libel and slander, false arrest, and malicious prosecution.'"
Frank, Courts on Trial 124 (1949).

In a speech delivered this past summer to the Conference of State Chief Justices, Chief Justice Burger discussed the hardship created by asking lay jurors to sit for long periods of time in cases involving complicated legal and factual issues. He called upon the legal profession to begin an examination of alternatives to the use of juries in complex civil cases. *See* reports of the Chief Justice's speech at: 48 U.S.L.W. 2118–2119 (Aug. 14, 1979); The National Law Journal, Aug. 13, 1979, p. 21. We view these remarks as suggestions designed to initiate further study

nents of the use of juries in complex civil cases generally assume that jurors are incapable of understanding complicated matters. This argument unnecessarily and improperly demeans the intelligence of the citizens of this Nation. We do not accept such an assertion. Jurors, if properly instructed and treated with deserved respect, bring collective intelligence, wisdom, and dedication to their tasks, which is rarely equalled in other areas of public service.

Although various views have been expressed about the practical abilities of jurors, there has been little substantive research done on the subject.[67] This is due, in part, to the sacrosanct manner by which our country has regarded the jury's deliberative process. In the federal courts we generally do not allow any inquiry or challenge based on what occurs in the jury room.[68] In fact, the only major study undertaken in this area, which violated the sanctity of the jury room, resulted in a public censure by the

Attorney General of the United States and a Congressional investigation.[69]

Opponents of the use of juries in civil cases look to the virtual abolition of the civil jury in Great Britain as support for why a similar course should be followed in this country. However, an examination of the British experience does not support the conclusion that the gradual obsolescence of the civil jury there resulted from any consideration of the practical abilities and limitations of juries. In fact, the two principal causes of the civil jury's decline were a manpower shortage during World War I and an economy drive during the depression.[70] Neither consideration carries any weight in this country; we do not have a manpower shortage and the cost of juries is minimal at best.[71] And the most important factor which makes the British analogy inappropriate is that the civil jury was never afforded the constitutional protection in

into the use of juries, not as comment upon the constitutional question addressed in the present case.

**67.** See Note, 92 Harv.L.Rev. 898, 918 (1979).

**68.** The federal courts have traditionally protected the jury's deliberative process by preventing challenges to the verdict based on any arguments, statements, discussions, emotional reactions, votes, or methods used, in reaching a verdict. See Fed.R.Evid. 606(b) and the accompanying Advisory Committee Note. The Supreme Court has explained that if the rule were otherwise, then ". . . the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference." *McDonald v. Pless*, 238 U.S. 264, 267–268, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). Additionally, almost every verdict would be susceptible of some challenge, forcing judges to become ". . . Penelopes, forever engaged in unraveling the webs they wove." *Jorgensen v. York Ice Machinery Corporation*, 160 F.2d 432, 435 (2d Cir. 1947), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349.

The origin of this rule, as are many other common law rules, is traced to Lord Mansfield. In *Vaise v. Delaval*, 99 Eng.Rep. 944 (K.B. 1785), he refused to consider affidavits showing that a jury had reached a verdict by lot. This basic rule preventing subjective challenges to

the verdict of a jury survives today and is embodied in Fed.R.Evid. 606(b):

"(b) *Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes."

**69.** Kalven and Zeisel, The American Jury vi–vii (1965).

**70.** Devlin, Trial by Jury 131 (1956); and *see* Higginbotham, *supra* n. 56 at 51–52.

**71.** As one commentator observed a few years ago, the amount which is spent annually on federal juries could buy two jet fighters, providing "they weren't too sophisticated." Janata, *Federal Civil Jury Trials Should Not Be Abolished*, 60 ABA Law J. 934 (1974).

Great Britain that it has received in this country.[72]

As we noted earlier (*see* n. 17, *supra*), the outcome in *ILC Peripherals v. International Business Machines*, 458 F.Supp. 423 (N.D. Cal.1978), is used as an example of a jury's inability to serve as a fact-finder in complex cases. After discharging the deadlocked jury, the district judge asked the foreman whether a case like *ILC Peripherals* should be heard by a jury, to which the foreman responded as follows:

> "If you can find a jury that's both a computer technician, a lawyer, an economist, knows all about that stuff, yes, I think you could have a qualified jury, but we don't know anything about that."

458 F.Supp. at 447. Although we can sympathize with the frustration that this juror must have felt after being deadlocked for nineteen days, it does not necessarily follow that the parties would be any better off trying the case to a judge rather than a jury. Although judges are lawyers, they generally do not have any more training or understanding of computer technology or economics than the average juror. Whether a case involves computer technology, aircraft design, or accounting, attorneys must still educate the uninitiated about the matters presented in their case. While we express great confidence in the abilities of judges, no one has yet demonstrated how one judge can be a superior fact-finder to the knowledge and experience that citizen-jurors bring to bear on a case. We do not accept the underlying premise of appellees' argument, "that a single judge is brighter than the jurors collectively functioning together." [73]

In fact, the vast majority of the parties to this appeal oppose the decision to strike the demand for jury trial. We are impressed with this vote of confidence in the jury system shown by the litigants (both plaintiffs and defendants) and their experienced counsel. This serves as additional support for this court's belief that the present case is not beyond the practical abilities of a jury. In fact, experience demonstrates that juries are capable of sorting out complex factual issues and applying the law to them.[74]

## IV. CONCLUSION

Not only do we refuse to read a complexity exception into the Seventh Amendment, but we also express grave reservations about whether a meaningful test could be developed were we to find such an exception. Where would the courts draw the line between those cases which are, and those which are not, too complex for a jury? The court below found that the complexity of the present case was created primarily by the accounting and financial nature of the issues and evidence. The appellees generally assume that only antitrust and securities cases could qualify for the complexity exception. We acknowledge the complicated nature of the evidence and issues associated with the accounting and financial questions involved in antitrust and securities cases. Yet, almost all tax cases also involve the same type of evidence and issues; does this then mean that there should not be a right to jury trial in this broad class of cases as well?

Many other types of cases also require a jury to unravel complicated factual issues totally unrelated to financial or accounting problems. Products liability cases almost always require an inquiry into the design of the product, which includes the plan, structure, choice of materials, and specifications which were used. For instance, cases arising from airplane crashes often present difficult issues, the resolution of which is dependent upon engineering evidence relating to the design, metallurgy, materials, and service. Inevitably, both sides will present expert testimony on the different issues. Will this type of case also come within the

---

**72.** Higginbotham, *supra* n. 56, at 52–53.

**73.** *Id.* at 53.

**74.** The American Jury System 19 (1977), Final Report of the (1977) Annual Chief Justice Earl Warren Conference on Advocacy in the United States (The Roscoe Pound-American Trial Lawyers Foundation).

complexity exception? Should we draw a distinction based upon whether a case involves engineering or accounting issues? Once we open the door, it would be difficult to keep it only partially open. In answering the Seventh Amendment question, we believe that any test which is dependent upon the complexity characterization of a case would be too speculative to be susceptible of any type of practical application.

Another argument which weighs heavily against the need for a complexity exception to the Seventh Amendment is provided by the procedural checks which a judge may exercise after a jury has returned a verdict. A new trial may be granted under Fed.R. Civ.P. 59 when the verdict is against the weight of the evidence, the damages are excessive, or the trial was unfair for some reason.[75] And, a judgment notwithstanding the verdict under Fed.R.Civ.P. 50 may be granted if there was not enough evidence to make an issue for the jury.[76] These procedures protect litigants from the risk of a jury reaching an "irrational" verdict.[77]

Although we express great confidence in the jury system, some of the points raised by its critics should not be summarily dismissed. However, in view of the mandate of the Seventh Amendment, time might be better spent in searching for ways to improve rather than erode the jury system.

We hold that there is no complexity exception to the Seventh Amendment right to jury trial in civil cases. We do not believe that the equitable action for an accounting can be stretched so as to include all the complex commercial cases which arise today. Moreover, we decline the invitation to read the *Ross* footnote as establishing a new interpretation of the Seventh Amend-

ment. And we do not believe any case is so overwhelmingly complex that it is beyond the abilities of a jury. The order striking the demands for jury trial is REVERSED and this case is REMANDED for trial.

REVERSED.

KILKENNY, Circuit Judge, dissenting:

Although Judge Anderson presents mighty forceful arguments in favor of his respective theories, I remain convinced that the highly complicated issues presented by this litigation are such that an attempt to dispose of them in a jury trial would result in nothing short of judicial chaos.

It is my considered judgment that Judge Turrentine's opinion "covers the waterfront" and adequately responds to every proposal of the majority. *In re U. S. Financial Securities Litigation*, 75 F.R.D. 702 (1977). To express the same views in my own language would add nothing to the persuasiveness of the district court's opinion.

The fact that a number of the cases may have been settled since the consolidation and the order of the court striking the demands for a jury trial is of no consequence. If judicial power to proceed was present at the time of striking the jury trial demands, it would not be lost by reason of the settlement of claims subsequent to that time.

---

**75.** *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

**76.** For example, when "the evidence permits only one reasonable conclusion as to the verdict." *Fountila v. Carter*, 571 F.2d 487, 489–490 (9th Cir. 1978).

**77.** *See Curtis v. Loether*, 415 U.S. 189, 198, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Jones v. Orenstein*, 73 F.R.D. 604, 606 (S.D.N.Y.1977).